CITIZEN, The (BIBBINS v.). See Case No. 1,384a.

CITIZENS' SAV. BANK (WATSON v.). See Case No. 17,279.

## Case No. 2,730.

CITIZENS' BANK v. NANTUCKET STEAMBOAT CO.

[2 Story, 16.][1]

Circuit Court, D. Massachusetts.   Oct. Term, 1811.

CARRIERS — RIGHTS—DUTIES AND LIABILITIES — WHAT CONSTITUTES A CARRIER — EVIDENCE — PROOF OF DOCUMENT—COMPETENCY OF WITNESS —"MERCHANDISE"—PLEADING IN ADMIRALTY— BLENDING ACTIONS IN REM AND IN PERSONAM.

1. The transportation of passengers, or of merchandise, by common carriers, does not necessarily imply that the owners are not common carriers of bank notes or specie. The nature and extent of that employment or business which the owners expressly or impliedly hold themselves out as undertaking, furnishes the limits of their rights, duties, obligations and liabilities.
[Cited in Baxter v. Leland, Case No. 1,124; The New World v. King, 16 How. (57 U. S.) 473.]

2. No person is a common carrier, in the sense of the law, who is not a carrier for hire. It is not necessary, that the compensation should be a fixed sum; it is sufficient if it be in the nature of a quantum meruit, enuring to the benefit of the owners. Nor is it necessary, that the goods or property should be entered upon a freight list, or the contract be verified by any written memorandum; although both may be important ingredients in ascertaining the true understanding of the parties, as to the character of the bailment.
[Cited in New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 420.]

3. Where, in answer to a cross interrogatory, proposed by counsel in a deposition, as to whether the witness had received a release from all liabilities, the witness produced the release from his own possession, as a part of his testimony; it was held, that he need not prove the execution of the release by the subscribing witness. And the question having been asked by the respondents, in order to establish the competency of the party as their own witness, they were estopped from denying it.

4. But in the case of a release, produced by a party to a suit, to establish his own title he must prove its due execution by the subscribing witness.

5. A release of all actions and causes of action, or of a particular cause of action, which has happened before the time of the release, will discharge the witness from all liability, dependent upon the event of the suit, in which he is called to testify, touching his conduct in the matters on which the suit is founded.
[Cited in The Peytona, Case No. 11,058.]

6. Quaere, whether usages and customs can be introduced as evidence to control the construction of contracts, and the principles of law.

7. Where a certain charter, incorporating the Nantucket Steamboat Company, granted a right to run a steamboat "for the transportation of merchandise," and the master thereof, being intrusted with a certain sum of money in bank bills, lost it, or never duly delivered it; it was held, that the term "merchandise" does not apply to mere evidences of value, such as notes, bills, checks, policies of insurance, and bills of lading, but only to articles having an intrinsic value, in bulk, weight, or measure, and which are bought and sold; and that, in order to render the company liable, it must be clearly proved, that they had held themselves out to the public as common carriers of bank bills for hire; and that they had authorized the master to contract on their account and not on his own, for the carriage thereof, which in the present case was not established by proof.
[Cited in The Marine City, 6 Fed. 416.]

8. The onus probandi was upon the libellants to make out a prima facie case, in the affirmative; and then the onus probandi of displacing this inference was shifted upon the respondents.

9. The knowledge of the owners, that the master carried the money for hire, would not affect them, unless the hire was on their account, or unless the master held himself out as their agent in that business, within the scope of the usual employment and service of the steamboat.

10. Proceedings in rem and in personam cannot be blended in one libel.
[Cited in The Zenobia, Case No. 18,208; Ward v. The Ogdensburgh, Id. 17,158; The Young America, Id. 18,178; The Clatsop Chief, 8 Fed. 164; The Alida, 12 Fed. 344; The Director, 26 Fed. 710.]

Appeal from the district court of the United States for the district of Massachusetts.]

Libel in admiralty.   The libel states in

---

[1] [Reported by William W. Story, Esq.]

substance as follows: That on or about the 22d day of October, last past, the libellants were the owners of a certain package, containing a large number of bank bills, issued by the president, directors and company of the Pacific Bank, in Nantucket, the particular denominations of which the libellants are unable to set forth, but the whole sum and amount whereof was $1,600, of the lawful money of the United States of America, and, also, containing a check drawn by the cashier of the said Pacific Bank on the president, directors, and company of the New England Bank, a banking corporation duly established by law in the state of Massachusetts, for the sum of $422, which said package was directed to J. B. Congdon, Esq., cashier of the Merchants' Bank, New Bedford. That the respondents were the owners of a certain steamboat called the Telegraph, whereof Lot Phinney was master, which said steamboat was then, and had been for some time, employed in carrying passengers and freight from the island of Nantucket to the main land of Massachusetts, and particularly to the town of New Bedford. That the libellants by their cashier, Mr. Starbuck, delivered the said package to the said Phinney, to be carried by and on board the said steamboat from Nantucket to New Bedford aforesaid, and there to be delivered, the dangers of the seas excepted, to the said Congdon, for a certain reasonable freight to be paid therefor; and the said master thereupon accepted the said package, and understood and agreed, that the same should be carried and delivered as aforesaid, or else, as the libellants aver, the said package was delivered as aforesaid to the respondents, through the said master, to be, by the said respondents, transported and delivered as aforesaid; all dangers and accidents and losses excepted, save such as should arise from want of ordinary care on the part of the said respondents or their agents. That the said respondents never did deliver the said package or any of the contents thereof to the said J. B. Congdon, or to any other person at New Bedford aforesaid, or elsewhere, for the use of the said libellants, but through want of ordinary care did lose the same. That by reason of the premises, the libellants have wholly lost and been unlawfully deprived of the said package and the contents thereof, and of all benefit and advantage therefrom, and have suffered damage to the extent of $1,600, for which the respondents are liable, and ought justly to pay to the libellants. The libel concludes with a prayer for the allowance of the said damages and for general relief.

The answer denies any knowledge on the part of the respondents, that the libellants were the owners of the package, as alleged, and of the contents of the package, or that the said package was delivered to Lot Phinney, in the manner and for the purpose alleged, or that the package, if so delivered to him, was not by him safely carried and delivered, as is alleged, or that the libellants have suffered any loss, or the respondents incurred any liability as alleged. The answer goes on to allege that the libellants, and other corporations and persons in Nantucket and New Bedford, have frequently, as these respondents have been informed and believe, delivered sums of money or packages of bank bills to the said Phinney, to be by him carried, as their agent and for their accommodation, to and from the said places, for the purpose of making payments and deposits, and of other mercantile transactions, but that the said packages were not so delivered to or received by the said Phinney, in his capacity of master of the said boat, nor as within the scope or course of any business, which he was authorized to transact, as such master, and were not delivered to him, and received by him, to be carried for any stipulated or implied hire or reward, to be paid to him or to the owners of the said boat, but were so received and delivered for the accommodation of the said corporation and persons; that if any compensation was made to the said Phinney, it was made as a gratuity or voluntary donation for his private and personal benefit, and not as stipulated or agreed reward or hire; that these respondents have never authorized directly or indirectly the said Phinney to carry on such transactions on their account and risk, and in their behalf, and have never received any payment, hire or reward, for such services, as will appear by their book of accounts, which is submitted for examination; and that such services were in behalf of the persons sending such packages, and of the libellants in the case alleged, as their agent and servant, and not as the agent and servant of the respondents; that the said Phinney had no authority to enter into any such contract to carry and deliver such packages as is set forth in the libel, in behalf of these respondents, and that they have never received any reward therefor, nor has any been tendered to them or to any one as their agent; but that the same, if received and carried by the said Phinney, was received by him to be carried on his own individual risk and responsibility, and not on the risk and responsibility of these respondents. That from the insulated position of the community, it has been necessary to send, at all times, money by water conveyance, a portion of the distance, to the various places with which they have business connections, and that packages of money have been for a long period of time, conveyed by packet masters, without receiving compensation.

The cause came on to a hearing in the district court upon the libel and other pleadings, and evidence in the case; and the late district judge, (Judge Davis,) upon the hearing, in January, 1840, dismissed the libel with costs. [Case not reported.] From the decree of dismissal an appeal was taken by the libellants to the circuit court.

O. P. Curtis, for libellants.

The respondents are common carriers. The charter incorporating this steamboat company (Stat. 1833, c. 11) grants to sundry persons the authority to run a steamboat and two other vessels, for the convenience of the public travel and the transportation of merchandise, between Nantucket and New Bedford. The respondents do not aver, that the company have not the right to carry bank bills or specie as freight, but only, that the libellants and others have sent packages of bills by Phinney as their agent, and not as master of the vessel, and that the respondents have never authorized Phinney to carry money in their behalf, nor have received any compensation for so doing. The respondents cannot argue, (as they have not so averred), that the property sent by the libellant, was not such property as they might legally carry; and if they could, such would not be a true construction of the charter. Specie and bank notes come within the definition of merchandise, "any thing to be bought or sold." By the Revised Statutes (c. 97, p. 21), bank notes may be taken in execution and sold like other chattels. So, in New York (Handy v. Dobbin, 12 Johns. 220), a policy of insurance on "property" covers bank bills. Whiton v. Old Colony Ins. Co., 2 Metc. [Mass.] 1–7. Shaw, C. J., says in 20 Pick. 9, 13: "The word merchandise is broad enough to cover stocks or shares in incorporated companies;" and the same court decided in another case, that the sale of such shares was within the statute of frauds. Tisdale v. Harris, 20 Pick. 9. Bona et catalla include choses in action. Calye's Case, 8 Coke, 33. In Allen v. Sewall, 2 Wend. 327, it was decided by the supreme court, and afterwards by Chancellor Walworth, that bank notes came within the words "goods, wares, and merchandise," and judgment was given against the defendants. The court of errors, however (6 Wend. 335), overruled the decision, it appearing, that the master had been forbidden by his employers to carry bank bills.

There may be common carriers of bank bills, as well as of any other species of property. Kemp v. Coughtry, 11 Johns. 109; Dwight v. Brewster, 1 Pick. 50. And there is nothing in the present charter to prohibit the respondents from carrying bank bills, either gratuitously or for compensation. It is not necessary, in order to charge a person as a common carrier, to prove that a specific sum was agreed on for the hire; for if none is agreed on, he is entitled to a reasonable compensation. Story, Bailm. 505; 6 Wend. 350. And common carriers are liable for property lost or destroyed by gross negligence, even where they carry it without hire. Foster v. Essex Bank, 17 Mass. 498. Common carriers are responsible for the acts of their servants and agents, and any arrangements with them, whereby they may receive exclusively the compensation for the carriage of particular packages, will not exempt the carrier from responsibility for loss, unless it be known to the party, when it may be deemed that he contracts exclusively with the servant or agent. Tracy v. Wood [Case No. 14,130]; Story, Bailm. 507. Where the master of a vessel is consignee of the goods to sell them, and it is the course or usage of trade for the master to receive, on behalf of the owner, a compensation, which is divisible between the owner and master, by private agreement, the owner is responsible. Id. 546; Emery v. Hersey, 4 Greenl. 407; Kemp v. Coughtry, 11 Johns. 107. The freight of the cargo is the compensation for the whole duty performed. 2 Kent, Comm. (3d Ed.) 609; Kemp v. Coughtry, 11 Johns. 107. So, if the master of a vessel, who is the agent of the owners, receive the property of another to be carried in his vessel, the owners are bound by his contract, unless they can prove that his authority was limited, and that it was known to be so to the other party. Ward v. Green. 6 Cow. 173; 1 Bell, Comm. § 432; 2 Kent, Comm. (3d Ed.) 609; Story, Ag. 119; The Rebecca [Case No. 11,619]; The Phebe [Id. 11,064]. It is the duty of the carriers to take the utmost care of the goods; to make a right delivery of the property, according to the usage of trade, or the course of business; and to expose the property to no unnecessary hazard. Story, Bailm. 327, 509, 543. And the onus probandi is on the carrier to exempt himself from liability (Id. 529), which attaches from the time of his acceptance of the goods, and does not cease until no duty remains to be done by him (Id. 533, 538). Where there is no fraud or intentional concealment of the value of the parcel, the carrier is responsible for the whole value, unless he bring home to the other party notice of the limitation of the carrier's authority.

In the present case, Capt. Phinney is the master of a steamboat established expressly for a carrier. The cashier of a bank delivers to him parcels to be delivered to another cashier. He knows from the course of dealing, and also from his being paid for carrying them, that the parcels contain money and valuables. He asks no questions as to value, and prescribes no limits to his responsibility; and various small sums are paid to him, as the cashier testifies, by way of freight. No notice of any private instructions of his employers is brought home to the libellants or their cashier; nor does it appear there were any such, forbidding him to take money, although it is matter of notoriety that he carries such packages for pecuniary reward. A parcel is lost by gross carelessness of the master; for what could be more so, than for the carrier or his servant to hang his coat, containing a package of bank notes, on a chair, and to go to bed and to sleep, in another room, in a house filled with people, some of whom were strangers? Tracy v. Wood [Case No. 14,-

130]. Why did he not carry it to Mr. Congdon's house, if the bank was closed? But Phinney declared, that he did not think of the package after leaving the bank till the next morning.

What is the ground of defence against this claim? 1st. A general denial of the delivery of the parcel to Phinney, of its contents, and of its loss by him, all of which we have proved. 2d. That the libellants delivered their parcel (if at all) to Phinney, as their agent, and not as the servant or agent of the owners (respondents.) This we deny. Phinney was and had been for a considerable time in the open and notorious command of the boat, with all the usual powers of master. No limitation or restriction of the common authority of the master of a carrying vessel was prescribed by his owners, and his contracts have the same effect in law as if they were the personal acts of the owners. The Phebe [supra]. The property was delivered on board the respondent's vessel, to the respondent's servant, who was the master of said vessel. It was carried in their vessel. Whatever time was occupied by Phinney in transacting the business was their time, for the whole time of the master is due to the owners. Abb. Shipp. p. 132. It was delivered under a contract to pay for the transportation. Mr. Starbuck swears to this positively, and that when he first sent packages of money he did not know Phinney by sight; he was a stranger to him. But if no specific compensation had been expected, to obtain the freight of other merchandise was the object in view, and this was the motive of the directors in permitting their master to carry small packages without particular charge of freight; and this was a sufficient consideration on their part. This case closely resembles that of Foster v. Essex Bank, 17 Mass. 498, which was to recover the value of a special deposit of specie, taken without reward. The court say, "As the building and vaults of the company were allowed to be used for this purpose. and their officers employed in receiving into custody the things deposited, the corporation must be considered as the depositary, and not the cashier or other officer, through whose peculiar agency commodities may have been received into the bank." There, the bank derived no benefit whatever from the deposit, yet were holden to be liable for any loss arising from gross negligence. Here the steamboat company obtained the benefit derived from the freight of the merchandise of the directors and principal owners of the bank; for if the respondents had refused to carry bank bills, &c., for the bank, they would have lost the carriage of their merchandise. The capacity in which Phinney received the package was as master of the boat, and therefore as agent of the owners, and they were bound to give notice if they meant to limit his authority. There was not a syllable of his receiving it in any other capacity. If Starbuck, when he first sent money by him, did not even know him by sight, why should he trust him personally? It is incredible, that the cashier should confide a large sum of money to a stranger, unless he relied on his official character as agent and servant of the respondents. The contract of the respondents was that of common carriers, and carriers are liable for every species of loss, except such as are caused by inevitable accidents or by the public enemies. This rule is enforced in the case of a steamboat, grounding by mistaking a light in another vessel for a light-house. McArthur v. Sears, 21 Wend. 190. The case at bar is almost exactly like the case of Allen v. Sewall, 2 Wend. 327. But the respondents attempt to set up a usage, by which the master of their boat is to be deemed the agent of the bailors, and not of the steamboat company. There is no evidence in this case sufficient to establish a certain and uniform usage by the respondents to carry packages without making themselves responsible for them, in case of loss. Such a usage cannot be determined by the opinion of witnesses, but must be established by instances. Winthrop v. Union Ins. Co. [Case No. 17,901]; Cunningham v. Fonblanque, 6 Car. & P. 44, 2 Burrows, 1228; Savill v. Barchard, 4 Esp. N. P. 53. And such a usage cannot be sustained in opposition to established principles of law. Homer v. Dorr, 10 Mass. 26; The Reeside [Case No. 11,657]. There is no evidence here to establish any certain and uniform usage to carry money without compensation and without the carriers making themselves accountable for it. Wood v. Wood, 1 Car. & P. 59, 7 Car. & P. 711; Bleaden v. Hancock, 4 Car. & P. 152. To exempt themselves, they must also prove a usage not to pay for such property, if lost. 22 Pick. 108. The burden of proof is on the respondents to establish the entire usage. Not a single instance of loss by the respondents is shown: if the previous practice of the packet masters is admitted, only two instances are shown, in all time; one was by shipwreck, the other by theft; and this last was of a sum of money received by the master for goods sold by him as agent of the shipper.

F. C. Loring, for respondents.

On the evidence, the matters in dispute are the nature of the contract, and the parties to it, and the question of negligence. To make the respondents liable as carriers, the libellants must prove a delivery of the package to the master of the boat, as the agent of the respondents, and that it was to be carried for hire. The proof of a special contract is not made out, and is contradicted by the evidence in the case. The libellants then resort to the presumptions arising from the facts, that the respondents were owners of the boat,—the master their servant, viz., that the package was received by him to be

carried as their agent, and for a reasonable compensation. Their own evidence does not make out such a case. For it appears, that it was not the usual business of the boat to carry packages of money for hire, and there is no proof of any authority in the master so to do. It also appears, that, for many years, the libellants have been in the habit of sending packages of this kind by the boat, and that the whole amount paid by them as a compensation or gratuity to the master is $13. The entire inadequacy of this sum, considered as a compensation for the trouble of carrying these packages, and the assumption of the risks of common carriers, shows, that neither party could have considered the contract as of that nature. If this ground fails, the libellants must resort to the contract of mandate, and show, that the respondents were the mandatories, and that there was gross negligence. The respondents admit, that the contract was a mandate, but deny, that they were parties to it, and that there was such negligence.

All the elements of a mandate are here to be found. 1st. The thing to be done, to wit, the carriage, and delivery of the package: 2d, that the contract was gratuitous: 3d, that the parties to it, to wit, the libellants and the master of the boat, voluntarily entered into it. To prove these positions, and that the master was the mandatary, and the respondents were not parties to the contract, they offer proof of former transactions between the libellants and the present and former masters of the boat, and of the constant practice and usage at Nantucket, existing ever since its settlement, in relation to the carriage of similar packages. It is not attempted to show that the law or liability of carriers, or mandataries, is different at Nantucket from what it is elsewhere, but only to ascertain what was the nature and extent of the contract, and the meaning of the parties, from the prevailing usage, and their former dealings in the absence of an express contract; and for that purpose, evidence of usage is always admissible, The Paragon [Case No. 10,708]; The Reeside [supra]. If it can be shown, that the masters of this boat, and of vessels belonging to Nantucket, have been for many years in the constant practice of rendering such services gratuitously, and that this service was rendered in the usual manner, the presumption then arises, that this service was performed gratuitously, and not for hire. There can be no quantum meruit in such a case; for that arises by implication of law, where there is no contract; such a custom would make a contract. If the master had been in the habit of carrying such packages for hire, he might recover in a quantum meruit; but not if his practice were otherwise, and he had made no special contract for hire. The evidence shows that it has been the daily practice of merchants, banks, and persons generally, at Nantucket, to send packages of bills to the main land by the masters of boats and vessels for many years; and no compensation is ever demanded for this service; that frequently other services, such as the payment of notes or bills, the settlement of accounts, (certainly no part of the duties of common carriers,) are required; that no compensation is usually given; and when made, is given to the master, and intended, either to cover expenses incurred or as an acknowledgment to him personally for a favor rendered; that the owners of the vessel never received any compensation; and that this practice is universally known and understood at Nantucket; but that whenever a receipt was required, which was very unusual, and was imagined to impose an additional degree of responsibility, a commission was charged.

If this evidence shows the contract to have been a mandate, the next inquiry is, who was the mandatary? If the respondents, it is only because the master was for certain purposes their agent. The presumption arising from this fact may be rebutted by proof, that the agent, in making this contract, was not acting in the scope of his authority, or that the bailor contracted with him personally. This inquiry, as to the bailor, is equally material, whether the contract is to be considered as a bailment for hire, or as a mandate. If it was a mandate, it would seem to be a necessary conclusion, that the master was the bailee, and not the owners. For it would be unreasonable to suppose, that they employed and paid him to do friendly acts for his neighbors. The presumption, that he was acting in the scope of his business, which was to carry freight and passengers for hire, could not arise in relation to acts from which the owners derived no advantage. If it was a bailment for hire, the owners could not be responsible, if it appears, that they never authorized the master to carry packages of money for hire, and that the libellants knew so; or that they allowed him to retain whatever compensation was given to his own use, and that the libellants knew so; for then the contract was made with him and not with them.

1st. The charter of the respondents (St. Jan. 26, 1833, c. 11), gives them no authority to engage in the carriage of such packages either gratuitously or for hire. The charter is granted "for the convenience of public travel, and transportation of merchandise." Bank bills are in no sense merchandise. The custom of carrying bills gratuitously existed long before the charter was granted, was known to the corporators, and probably considered in framing the charter. It was known, that this custom was of great importance to the islanders; that such packages could not be carried as freight, except at rates, which would cover the risks of guaranty and insurance; and that the transportation of them on such terms would be of no public advantage. They, therefore, never intended to be carriers of

bank bills, and confined their powers to the carriage of merchandise. There is no proof of any authority to the master to carry such packages for the owners; and no presumption can arise of any, when their business is limited by law in such manner as not to permit of it. The presumption is, that they conformed to the law, and the charter is constructive notice to the public of the limitation of the powers and business of the corporation.

2d. If the proof be, that whatever compensation was given, was intended for and received by the master to his own use, it follows, that he was the bailee. If the contract were a bailment for hire, this conclusion is necessary, because the carrier is liable only in consequence of his reward: if a mandate, then the person to whom the gratification was made was the mandatary, conferring the obligation of which the gratification was the acknowledgment. That the obtaining of freight was not an inducement to carry these packages gratuitously, appears from the evidence, that they were carried ind'scr:minately for every one, whether likely to furnish freight, or not; that the freighting business is almost exclusively in the hands of the respondents, so that they are not in danger from competition; and that the withdrawal of their supposed liability as carriers, or as mandataries of these packages, could not affect their other business, is obvious, because all the witnesses, except Starbuck, say that it never was imagined that the respondents incurred any responsibility for them. The proof is conclusive that the respondents never received any advantage or pay for the carriage of such packages; that the compensation sometimes made to the master was so trifling, and so seldom given, that it could not affect the rates of wages required by him; and that it was always intended for him: and not one witness can be found to testify otherwise. It is not pretended, that the respondents were direct parties to this contract, and it is proved, that it was not in the scope of their business, and that they derived no benefit from it; therefore, they are not the bailees. It is proved, that compensation was made very infrequently, and for other services, as well as the carriage and delivery of the packages, and that when made it bore no proportion to the risks assumed by common carriers, and was intended as a gratuity to the master; and that when any additional liability was supposed to be assumed, as by giving a receipt, a commission was charged, which was never done otherwise; and that the carriage of these packages, in this way, was a matter of most frequent occurrence, and no instance is known in which a master had refused to carry one gratuitously. The contract was, therefore, not a bailment for hire, but a mandate, and the master the mandatary. The fact, that compensation was occasionally given does not affect the nature of the contract, if not given or claimed as a

debt; nor would it be, if expected as a matter of course, if it could not be recovered at law.

The evidence as to the loss does not show such a case of gross negligence as to make a mandatary liable. Story, Bailm., passim; U. S. v. Duval [Case No. 15,015]; Davis v. New Brig [Id. 3,643]; The Rebecca [Id. 11,619]; Halsey v. Brown, 3 Day, 346; Story, Confl. Laws, 226; Trott v. Wood [Case No. 14,190]; Renner v. Bank of Columbia, 9 Wheat. [22 U. S.] 581; Allen v. Sewall, 2 Wend. 341; Id., 6 Wend. 350; King v. Lenox, 19 Johns. 235; Walter v. Brewer, 11 Mass. 99; Reynolds v. Toppan, 15 Mass. 370; Butler v. Basing, 2 Car. & P. 613; Tracy v. Wood [Case No. 14,-130]; The Rendsberg, 6 C. Rob. Adm. 142; Foster v. Essex Bank, 17 Mass. 498.

STORY, Circuit Justice. This cause has come before the court under circumstances, involving some points of the first impression here, if not of entire novelty; and it has been elaborately argued by the counsel on each side on all the matters of law, as well as of fact, involved in the controversy. I have given them all the attention, both at the argument and since, which their importance has demanded, and shall now proceed to deliver my own judgment. The suit is in substance brought to recover from the steamboat company a sum of money, in bank bills and accounts, belonging to the Citizens' Bank, which was intrusted by the cashier of the bank to the master of the steamboat, to be carried in the steamboat from the island of Nantucket to the port of New Bedford, across the intermediate sea, which money has been lost, and never duly delivered by the master. The place where, and the circumstances under which it was lost, do not appear distinctly in the evidence; and are not otherwise ascertained than by the statement of the master, who has alleged that the money was lost by him after his arrival at New Bedford, or was stolen from him; but exactly how and at what time he does not know. The libel is not in rem, but in personam, against the steamboat company alone; and no question is made, (and in my judgment there is no just ground for any such question,) that the cause is a case of admiralty and maritime jurisdiction in the sense of the constitution of the United States, of which the district court had full jurisdiction; and, therefore, it is properly to be entertained by this court upon the appeal.

There are some preliminary considerations suggested at the argument, which it may be well to dispose of before we consider those which constitute the main points of the controversy. In the first place, there is no manner of doubt that steamboats, like other vessels, may be employed as common carriers; and when so employed, their owners are liable for all losses and damages to goods and other property intrusted to them as common carriers to the same extent and in the same

manner, as any other common carriers by sea. But whether they are so, depends entirely upon the nature and extent of the employment of the steamboat, either express or implied, which is authorized by the owners. A steamboat may be employed, although I presume it is rarely the case, solely in the transportation of passengers; and then the liability is incurred only to the extent of the common rights, duties and obligations of carrier vessels of passengers by sea, and carrier vehicles of passengers on land; or they may be employed solely in the transportation of goods and merchandise, and then, like other carriers of the like character at sea and on land, they are bound to the common duties, obligations and liabilities of common carriers. Or the employment may be limited to the mere carriage of particular kinds of property and goods; and when this is so, and the fact is known and avowed, the owners will not be liable as common carriers for any other goods or property intrusted to their agents without their consent. The transportation of passengers or of merchandise, or of both, does not necessarily imply, that the owners hold themselves out as common carriers of money or bank bills. It has never been imagined, I presume, that the owners of a ferry boat, whose ordinary employment is merely to carry passengers and their luggage, would be liable for the loss of money intrusted for carriage to the boatmen or other servants of the owners, where the latter had no knowledge thereof, and received no compensation therefor. In like manner the owners of stage-coaches, whose ordinary employment is limited to the transportation of passengers and their luggage, would not be liable for parcels of goods or merchandise intrusted to the boatman employed by them to be carried from one place to another on their route, where the owners receive no compensation therefor, and did not hold themselves out as common carriers of such parcels. A fortiori, they would not be liable for the carriage of parcels of money, or bank bills, under the like circumstances. So, if money should be intrusted to a common wagoner, not authorized to receive it by the ordinary business of his employers and owners, at their risk, I apprehend that they would not be liable for the loss thereof as common carriers, any more than they would be for an injury done by his negligence to a passenger, whom he had casually taken up on the road. In all these cases, the nature and extent of the employment or business, which is authorized by the owners on their own account and at their own risk, and which either expressly or impliedly they hold themselves out as undertaking, furnishes the true limits of their rights, obligations, duties, and liabilities. The question, therefore, in all cases of this sort is, what are the true nature and extent of the employment and business in which the owners hold themselves out to the public as engaged? They may undertake to be common carriers of passengers, and of goods and merchandise, and of money; or, they may limit their employment and business to the carriage of any one or more of these particular matters. Our steamboats are ordinarily employed, I believe, in the carriage, not merely of passengers, but of goods and merchandise, including specie, on freight; and in such cases the owners will incur the liabilities of common carriers as to all such matters within the scope of their employment and business. But in respect to the carriage of bank bills, perhaps very different usages do, or at least may, prevail in different routes, and different ports. But, at all events, I do not see how the court can judicially say, that steamboat owners are either necessarily or ordinarily to be deemed, in all cases, common carriers, not only of passengers, but of goods and merchandise and money, on the usual voyages and routes of their steamboats; but the nature and extent of the employment and business thereof must be established as a matter of fact by suitable proofs in each particular case. Such proofs have, therefore, been very properly resorted to upon the present occasion. In the next place, I take it to be exceedingly clear, that no person is a common carrier in the sense of the law, who is not a carrier for hire; that is, who does not receive, or is not entitled to receive, any recompense for his services. The known definition of a common carrier, in all our books, fully establishes this result. If no hire or recompense is payable ex debito justitiae, but something is bestowed as a mere gratuity or voluntary gift, then, although the party may transport either persons or property, he is not in the sense of the law a common carrier; but he is a mere mandatary, or gratuitous bailee; and of course his rights, duties and liabilities are of a very different nature and character from those of a common carrier. In the present case, therefore, it is a very important inquiry, whether in point of fact the respondents were carriers of money and bank notes and checks for hire or recompense, or not. I agree, that it is not necessary, that the compensation should be a fixed sum, or known as freight; for it will be sufficient if a hire or recompense is to be paid for the service, in the nature of a quantum meruit, to or for the benefit of the company. And I farther agree, that it is by no means necessary, that if a hire or freight is to be paid, the goods or merchandise or money or other property should be entered upon any freight list, or the contract be verified by any written memorandum. But the existence or non-existence of such circumstances may nevertheless be very important ingredients in ascertaining, what the true understanding of the parties is, as to the character of the bailment. In the next place, if it should turn out, that the steamboat company are not to be deemed common carriers of money and bank bills; still, if the master was authorized to receive money and bank bills as their agent, to be transported from one port of the route of the

steamboat to another at their risk, as gratuitous bailees, or mandataries, and he has been guilty of gross negligence in the performance of his duty, whereby the money or bank bills have been lost, the company are undoubtedly liable therefor, unless such transportation be beyond the scope of their charter; upon the plain ground, that they are responsible for the gross negligence of their agents within the scope of their employment.

Having stated these preliminary doctrines, which seem necessary to a just understanding of the case, we may now proceed to a direct consideration of the merits of the present controversy. And in my judgment, although there are several principles of law involved in it, yet it mainly turns upon a matter of fact, namely, whether the steamboat company were, or held themselves out to the public to be, common carriers of money and bank bills, as well as of passengers and goods and merchandise, in the strict sense of the latter terms; or the employment of the steamboat was, so far as the company are concerned, limited to the mere transportation of passengers and goods and merchandise on freight or for hire: and money and bank bills, although known to the company to be carried by the master, were treated by them as a mere personal trust in the master by the owners of the money and bank bills, as their private agents and for which the company never held themselves out to the public as responsible, or as being within the scope of their employment and business as carriers.

The question has been made at the bar, upon whom, in this case, the burden of proof lies to establish, that the company were common carriers of money or bank bills, or not. It does not appear to me to be of any great importance in the actual posture of the present case, how that matter is decided. But I have no doubt, that the onus probandi is upon the libellants to establish the affirmative; for, until that is done, no liability can attach to the respondents; and the libellants are bound to establish a prima facie case; and indeed it is scarcely within the rules of evidence to call upon the respondents to establish the negative. But it seems to me the less necessary to sift this matter, since the evidence on the part of the libellants is in my judgment sufficient to establish such a prima facie case, at least to the extent of a compliance with the exigency of the rule. It is abundantly proved, that the masters of the steamboat have been constantly and habitually employed in the transportation of money and bank bills for banks and private persons (as indeed common packet masters were likewise employed long before steamboats existed) upon this very route, and upon the common routes from Nantucket to other ports. This usage, or practice, or employment, (call it which we may), was so notorious, that it must be presumed to be known

to the steamboat company; and indeed, that fact is not controverted. Under such circumstances the natural inference would be, that the transportation of money and bank bills was within the scope of the usual employment of the master in his official capacity, and on account and at the risk of the owners, unless the inference were repelled by other circumstances. The onus probandi then, of disproving this inference, may be deemed to be fairly shifted upon the respondents.

The ground of the defence of the company is, that in point of fact, although the transportation of money and bank bills by the master was well known to them, yet it constituted no part of their own business or employment; that they never were in fact common carriers of money or bank bills; that they never held themselves out to the public as such, and never received any compensation therefor; that the master in receiving and transporting money and bank bills acted as the mere private agent of the particular parties, who intrusted the same to him, and not as the agent of the company or by their authority; that in truth he acted as a mere gratuitous bailee or mandatary on all such occasions; and even if he stipulated for, or received, any hire or compensation for such services, he did so, not as the agent of or on account of the company, but on his own private account, as a matter of agency for the particular bailors or mandators. Now, certainly, if these matters are substantially made out by the evidence, they constitute a complete defence against the present suit. There are some facts in the case, which are beyond the reach of any just controversy. In the first place, there is no pretence to say, that the company have ever received any freight, hire, or compensation, for the carriage of money or bank bills transported in the steamboat, either from the master, or from the owners thereof, or have ever supposed themselves entitled thereto. No claim of that sort has ever been set up by them against the owners of such bank bills, or against the master, although the carriage of packages of money and bank bills by him has been constantly known and understood by them; nor has the master ever credited them with any such hire, freight, and compensation, although he has constantly credited them with the freight of goods and merchandise carried in the steamboat, whenever he has received it. This is a very significant circumstance to establish, on the part both of the master and the company, their mutual understanding of such transactions,—that they were mere private agencies of the master, and not agencies on behalf of the company, authorized by them, either as common carriers, or as mandataries. There is also a total absence of all evidence to establish that the company ever held themselves out to the public by advertisement or otherwise, through their directors, or the other regular officers of the corpora-

tion, as common carriers for such purposes; or that they ever entered into any contracts of this sort, for hire or compensation, directly with any person or persons for whose benefit the money or bank bills were transported. The most, that can be said, is, that the master might well be deemed their agent for such purposes. But that must proceed upon the ground, either that he had full authority, or that he was held out to the public as having full authority, or that his acts admit of no other reasonable interpretation. If his acts may just as fairly be attributed to a private personal agency for third persons, and, a fortiori, if taking all the circumstances, they naturally lead to the latter conclusion, then the presumption of the liability of the company therefor is completely repelled. In the next place, if the testimony of the persons, who have been successively masters of the steamboat is admissible, and is believed, they state facts and circumstances, which directly confirm the material grounds of the defence. They state in substance, that at the successive periods of their command of the steamboat, they have been accustomed to carry packages of bank bills for the banks at Nantucket, and for various private persons, to New Bedford, for several years, to the amount of hundreds of thousands of dollars; that they have always deemed themselves as acting therein as the private agents of the bailors; that they have never received any such packages for the account of the company or by their authority; that they have always done this business as gratuitous bailees, never charging any commission or requiring any compensation as a matter of right, except when requested to give a special receipt therefor, (which, however, was rarely done,) and then they charged on their own account a small commission; that they have occasionally received from the banks, as well as from private persons, a small compensation for these services, such as they chose to pay, as a mere gratuity, or voluntary recompense, but without any claim of its being due to them as a matter of right or duty; that such gratuities and recompenses have been rarely paid by private persons, and not even uniformly paid by the banks, which were in the constant habit of sending such packages; but it has been sometimes intermitted by them for a considerable length of time; and that such gratuities and recompenses were never accounted for by them to the company; but were always applied to their own private use and benefit.

Such is the substance of the facts and circumstances, either directly stated by the masters, or fairly deducible from their testimony. It is in no small degree corroborated in its general bearing by the testimony of common packet masters, who have been accustomed to carry like packages of bank bills for the last forty years, and who always treated such bailments as gratuitous, and as

special agencies of their own, and never claimed any compensation therefor, on account of the owners of their vessels. It is also in no small measure sustained by the absence of any positive testimony on the part of the libellants of any instances except those stated by Mr. Starbuck, in which a compensation has been claimed of banks, or allowed by them, as a matter of right by the master, or of its having been paid by individuals at any time otherwise than as a gratuity to the master, or as a personal compensation to him for his services. There is this additional consideration of no small weight, that if these packages were within the scope of the business of the company, and were carried at their risk, and for compensation and hire, it is surprising that there should not have been a uniform course of dealing with all persons sending the packages, and a uniform price, or at least a reasonable recompense, always charged on one side, and paid on the other. Yet there is a total absence of all proof to this effect. It is not pretended that the company ever received any such price or recompense, or ever claimed an account therefor from the master; or ever made it an item of charge or credit in their dealings with the bailors. How are we to account for such a state of things, if in truth they were incurring on every trip such vast risks and responsibilities for uncounted sums? One should suppose, that such risks and responsibilities would naturally introduce a regular commission or charge therefor, such as is generally paid in other cases, in nature of a commission del credere or guaranty. It would seem strange, that the company should slumber over their own rights during so long a period, and should indiscriminately receive all such packages from all persons, and yet should not charge any fixed commission, or uniformly claim any from the bailors for such risks and responsibilities. On the other hand, if these were cases of gratuitous bailments, or of personal agencies on the part of the master unconnected with his official duties, or the common business of the company, the state of the facts is exactly what it ought to be; and there is nothing which either requires explanation, or solicits inquiry. On the opposite supposition, there would seem to be many circumstances admitting of no reasonable or satisfactory explanation. But the testimony of the masters has been denied to be competent; and the exception has been especially urged against that of Capt. Phinney. The latter was the master, who took the package of bank bills, for the loss of which the present suit is brought. In order to establish his competency, notwithstanding his relation to the cause, the respondents upon their direct interrogatories annexed to his deposition, asked him, if he had not received a release from them of all liability on account of the subject-matter of the suit? He answered, that he had, and produced the supposed re-

lease and annexed it to his answer. Now, it was first objected, that his answer upon the interrogatories of the respondents was no proper proof of the execution of the release, (whatever might have been the case, if the answer had come out upon the cross examination upon the interrogatories of the libellants) but the execution should be proved by the subscribing witness. I thought at the argument, that the objection was untenable, and that it was wholly immaterial, by which party the question was asked; because a witness, producing a release from his own possession, as a part of his testimony, in answer to a question put to him, need not prove the execution of the release by the subscribing witness; but it is to be taken as a part of his testimony. Indeed, when the question was asked by the respondents in order to establish the competency of the party, as their own witness, they would be estopped afterwards to deny it, and the witness having received the release, it would be and must be treated as between him and them as a true and valid release, without any other proof. The case of such a release, produced by a witness, is entirely different from that of a release produced by a party to a suit, to establish his own title. In the latter case, the party must prove its due execution by the subscribing witness. Several of the cases cited at the bar turned upon this distinction. Moises v. Thornton, 8 Term R. 303; Jackson v. Pratt, 10 Johns. 381, were cases where the party to the suit founded his title upon the deed or diploma. The case of Hall v. Connecticut Steamboat Co., 13 Conn. 319, stands upon a distinct ground; for there the witness did not produce the release, nor did it appear ever to have been delivered to him, and his interest was established by independent testimony, and not upon his own examination or cross-examination. Whether some of the dicta in the opinion of the court are maintainable, or not, in point of law, is a matter, therefore, which this court is not now called upon to consider. In all cases of this sort, where the question of competency of a witness arises upon his deposition, and not otherwise, it is to be disposed of upon the interrogatories in the deposition, in the same manner as it would be upon an examination upon the voir dire; that is to say, the objection of incompetency may be removed in the same way and by the same evidence of the witness, by which it has been established. The doctrine is fully borne out by the language of Mr. Phillipps in the later editions of his work on Evidence, and by the cases there cited (Phil. Ev., Amos' 8th London Ed., 1838, pp. 149–151; S. P. 1 Phil. Ev., Cowen's 7th Am. Ed., 1839, p. 134); and especially by the case of Ingram v. Dada (before Lord Ellenborough, in 1817) 1 Car. & P. 235, note; and Goodhay v. Hendry, 1 Mood. & M. 319; and the case of Wandless v. Cawthorne, 1 Mood.

& M. 320, 321, note; and Carlisle v. Eady, 1 Car. & P. 234. Indeed, the only point of difference among the learned judges upon any of these occasions has been, not, whether the release should be proved by other witnesses; but whether it should be produced at the trial by the witness.

Another objection of a more serious cast has been taken to Phinney; and that is, that the release cannot be operative at all to discharge the master from the damages, which may be recovered by the libellants in this case, because it is not a release of a present but of a future interest, not yet vested in the releasors; and for this position the dictum of the court in Francis v. Boston & R. Mill Corp., 4 Pick. 367, 368, is relied on, that a release cannot operate to extinguish or defeat future rights or claims; a dictum, which may be perfectly correct, when applied (as it there was) to a release of future damages for future acts; but which cannot be applied to a release of future damages for past acts, without shaking the well established doctrine. If the argument be well founded, then every person, who is sued as principal, for any act of negligence of his agent, or servant, such as a coachman, or a factor, or a master of a ship, could not by a release restore the competency of such person; and yet, as we all know, this is every-day practice. In the case of Green v. New River Co., 4 Term R. 589, which was an action against the principals for the negligence of their agent, the court held the agent incompetent without a release; and by necessary implication, therefore, held him competent with a release. The same doctrine is abundantly shown to be well established by Mr. Phillipps in his treatise on Evidence, and in the cases there cited. Phil. Ev. (Amos' 8th London Ed., 1838) pp. 84–104; Id. 152; S. P. 1 Phil. Ev. (Cowen's 7th Am. Ed. 1839) p. 56; Id. 134; Com. Dig. "Release," E. See, also, Trueman v. Loder, 11 Adol. & E. 589, 596. Indeed, it may be taken as a general principle, in cases of this sort, that a release of all actions and causes of actions, or of a particular cause of action, which has happened before the time of the release, will discharge the witness from all liability depending upon the event of the suit in which he is called as a witness, touching his conduct in the matter on which the suit is founded; for the cause of the liability then existing, the release will operate to discharge that, and incidentally the future damages recovered on account thereof. The cases of Scott v. Lifford, 1 Camp. 246, and Miller v. Falconer, Id. 251, and Cartwright v. Williams, 2 Starkie, 342, are directly in point. Another objection was taken to the language of the release; and certainly there was an accidental mistake in it, which might, perhaps, have brought its true construction into doubt, as a release of the present cause of action. But I should have had no difficulty, if this objection had not been waived, in deciding,

that time ought to be allowed to correct the mistake, as it was obviously a matter of entire surprise upon all the parties thereto. But it does not appear to me, that, upon a just survey of the whole evidence, any thing very material hinges upon the admissibility of any of the witnesses whose testimony has been objected to; for the main facts are abundantly supported by evidence aliunde; and presumptive inferences against its force are equally repelled by the offer, as they would be by the production of their testimony. Now, it is not a little remarkable, (as has been already suggested), that most of the witnesses, who have been examined on each side, agree, that they never supposed the owners responsible, but they have treated the case as one of a private personal agency of the master, either gratuitous, or as his personal and private perquisite. Most of them have deemed the service gratuitous; and not one of them pretends, that the company ever, to their knowledge, held themselves out as common carriers, for hire, of bank bills; or that they avowed any responsibility for the carriage thereof, or ever demanded any compensation therefor.

The main stress of the argument for the libellants is, indeed. founded upon the general proposition, that steamboat owners generally are common carriers not only of passengers, but of goods and merchandise of all sorts, including money and bank bills, for hire. Now, if this were clearly made out, there would, in my judgment, be great difficulty in maintaining, that any evidence would be admissible to prove any usage or custom in this particular business, to exempt them from the ordinary liabilities of common carriers, and to throw the responsibility exclusively upon the masters of the boat. I have in former cases had occasion to express my entire dissatisfaction, with the practice of introducing supposed usages and customs, to control the construction of contracts and the ordinary principles of law. Donnell v. Columbian Ins. Co. [Case No. 3,987]; The Reeside [Id. 11,-657]. And I greatly rejoice to find, that my own doubts and difficulties have been fully borne out and confirmed by very recent decisions in England, and especially by the case of Trueman v. Loder, 11 Adol. & E. 589, 597–601, where the subject was very elaborately considered by Lord Denman, in delivering the opinion of the court. I am not unaware of the bearing of the cases of Halsey v. Brown, 3 Day, 346, and Renner v. Bank of Columbia, 9 Wheat. [22 U. S.] 582, 590, 591, in the opposite direction, but they are clearly distinguishable. They do not go to the extent of establishing that a local custom or usage will dispense with the principles of law; but merely to establish, in the one case, what the local custom, as to days of grace, was, and in the other case, what were properly to be deemed contracts on account of the owners of the ship, and what merely personal contracts of the master. That

is the very question involved in the present case. It is, therefore, assuming the very point in controversy, to assert, that the company in the present case were common-carriers for all purposes for the carriage of bank bills, as well as for the carriage of passengers and goods and merchandise for hire; and that the master acted as their agent, and on their account, in the receipt of bank bills, as well as in the transportation of passengers and goods and merchandise. That is a matter to be made out by proofs, establishing that it was within the ordinary scope of their business, and adopted and sanctioned by them; or, at all events, that they held themselves out to the public as general carriers to such an extent. It is said, that the owners of a ship are bound by the contracts made by the master thereof, notwithstanding he may have violated his private orders; and this is true, where the act done is within the scope of the ordinary employment of the ship; for to that extent he is held out by the owners as having a general authority. But this doctrine leaves the question quite open and untouched, what is the ordinary employment of the ship; for the master cannot bind them beyond it. Lord Tenterden in his treatise on Shipping (see Johnston v. Usborne, 11 Adol. & E. 549, 557) lays down the rule of law on this subject in its true terms, that the owners are bound to the performance of every lawful contract of the master relative to the usual employment of the ship (Abb. Shipp. pt. 2, c. 2, §§ 2, 3, 6); and he adds in illustration of the rule, that if a ship were built for the purpose of conveying passengers only, or merchandise only, and employed in that particular trade, the owners are not answerable for a contract made by the master to employ the ship for a different purpose or in a different trade; for it does not relate to the usual employment of the ship. Abb. Shipp. pt. 2, c. 2, § 3; Id. § 6. The case of Boucher v. Lawson, Cas. temp. Hard. 85, Id. 194, turned mainly at the argument upon this consideration. The property (gold) there taken on board in Portugal was on freight, and shipped under a bill of lading; and the special verdict found that fact, as also that it was usual, when any gold is exported from Portugal to England, for the master of the vessel to take the whole freight to his own use, without accounting for any part of it to his owners, unless there be some special agreement between them to the contrary, which there was not in that case. The cause was several times argued, and finally went off upon another point. Lord Hardwicke however seems to have thought, that the special verdict was not as full as it should be. He said, that the property being shipped on freight, and freight, being the fruit and earnings of the ship, by the rule of law, belonged to the owners, and the master was only entitled to wages; and, therefore, upon the terms of the bill of lading, the freight would belong to the owners under such circumstances. The usage might

not make any difference; for then it might amount only to this, that the owners intended to make an allowance to the master of this part of the freight, in consideration of paying him less wages, or on some other consideration; so that it would be but an allowance of part of their own profits to the master; and they would, notwithstanding, be liable. And, therefore, if the finding on the usage was to be taken consistently with the bill of lading, and the reward for carrying the gold was freight, and consequently by the rule of law belonging to the owners, they would be liable for the loss. The whole of his lordship's reasoning turned upon the peculiar wording of the special verdict, as to the shipment being on freight and technically so called; and upon this, that the taking of goods, on freight was within the scope of the ordinary employment of the ship. But it seemed to be understood on all sides, that if such was not the ordinary employment of the ship, or if the shipment was a mere personal contract of the master, on his own account, and he alone was entitled to the hire, and the owners had no title to the hire as owners, that then and under such circumstances, they were not liable for the loss. See Abb. Shipp. pt. 2, c. 2, §§ 6–9. The case of Dwight v. Brewster, 1 Pick. 50, 54, does no more than affirm that the owners are liable, where they are common carriers, and the profit made by the carriage of bank bills is within the scope of their business and for their account; and that of King v. Lenox, 19 Johns. 235, shows, that the owners are not bound for shipments not made in the course of the employment of the ship on their account, but on account of the privilege of the master. The case of Middleton v. Fowler, 1 Salk. 282, is, however, still more directly in point to the circumstances of the present case. There, the action was against the proprietors of a stage-coach for the loss of a trunk of the plaintiff; and Lord Chief Justice Holt was of opinion that the action did not lie, saying that a stage-coachman was not liable, within the custom, as a common carrier, unless such as take a distinct price for carriage of goods as well as persons; as wagons with coaches; and though money be given to the driver, yet that is a gratuity, and cannot bring the master within the custom, for no master is chargeable with the acts of his servant, but when he acts within the execution of the authority given by his master. See, also, Story, Bailm. §§ 500, 507, and cases there cited. The case of Allen v. Sewall, 2 Wend. 327, is not an authority the other way, for it was reversed upon error by the court of errors of New York. Sewall v. Allen, 6 Wend. 335. If I were compelled to choose between the relative authority of these decisions, upon the ground of the reasoning contained therein, I should certainly have deemed that of the court of errors the best founded in the principles of law. The reasoning of the court below in that case seems to me to have been founded mainly upon an assumption of the very point in dispute; that is, whether the owners of the steamboat were common carriers of money for hire; for no one can well doubt, that they were not liable therefor, if the ordinary employment of the steamboat, on account of the owners, was confined to passengers and common merchandise for hire, and that the carriage of money was a personal perquisite of the master upon his own sole account, and he received the same and pay therefor, not by their authority, or as a part of their business, or by their command, but simply at his own personal risk as special bailee. The knowledge of the owners, that he carried the money for hire, would not affect them, unless the hire was for their account, or the master held himself out as their agent in that business, as being within the scope of the usual employment and service of the steamboat. That is the true doctrine, and is fairly deducible from the case of Edwards v. Sherratt, 1 East, 604, although the circumstances of that case called for a somewhat modified statement of it. The case of Shelden v. Robinson, 7 N. H. 157, directly decided, that the driver of a stage-coach (the proprietors of which were common carriers of passengers, for hire), did not, by carrying packages of money and bank bills for hire, which he received for his own sole account, become himself responsible as a common carrier; but was merely a common bailee for hire, and subject only to the responsibilities thereof; which necessarily supposes, that he did not in such cases act as agent of the proprietors in their common stage-coach business; and that they were not responsible for his acts.

In short, in all cases of this sort, the true solution of every question of the liability of the owners of a steamboat must depend upon this, whether the master is acting within the scope of the ordinary employment of the owners of the boat, or not. If the master alone receives the hire for himself, and on his own sole account, and does it as a matter of favor and not of duty, and it constitutes no part of the business or employment in which the owners are engaged, and is not performed by their orders or authority, and they are entitled to no share of the profits, then the owners are not responsible, unless, indeed, the owners hold the master out to the public as acting in these respects for them, and as capable of binding them by his acts. And my judgment, therefore, is that the onus probandi is upon the libellants to establish, that the owners are common carriers to the full extent of incurring liability for the carriage of these bills before they are entitled to recover. If they leave the matter in doubt, that is decisive for the respondents. It is precisely in this view, that the evidence, as to the supposed usage or practice introduced into this case, is admissible, not to show, if the owners were common carriers of bank bills for hire, some usage or practice to treat

them as not liable for losses of bank bills intrusted to them, for I am not prepared to say that any such evidence would be admissible to control the well-established rules of law; but as evidence to show what was the ordinary employment or business of the company, and whether they ever held themselves out to the public as common carriers of bank bills for hire, or that the master was authorized as master to contract for the carriage thereof on their account. In this view it appears to me, that the evidence is exceedingly strong and cogent to establish that the public, at large, did not understand that the company ever held themselves out as common carriers of bank bills for hire, or even as gratuitous bailees; or that the masters of the steamboat ever held themselves out as capable or authorized to bind the company by any such contract, or that it was within the scope of the ordinary employment or business of the company. Most of the witnesses, as has been already suggested, treat it clearly as a case of personal agency of the master on his own personal account, either as a common bailee for hire, or as a gratuitous bailee. The weight of the evidence, indeed, seems to lead to the conclusion, that the master acted often, if not generally, as a gratuitous bailee, and that the reward sometimes paid him was either a mere gratuity, or at most a mere personal charge on his own account. If it was a mere gratuity, it would be difficult to show, how the company could be liable therefor, since it would be almost incredible, that they should be willing to incur said extraordinary risks without any compensation; and, indeed, since it might well be questioned, whether any such business was within the scope and objects of their charter. At all events, no presumption of this sort should be indulged, unless upon the most direct and positive proofs, that the company had expressly sanctioned and authorized it. And this leads me to say a few words upon the language of the charter of incorporation of the company, by the act of 1833. c. 11 (7 Mass. Sp. Laws, p. 283). That act incorporates the company, expressly for the purpose of running "a steamboat and two other vessels, not exceeding seventy-five tons each, for the convenience of the public travel, and the transportation of merchandise between Nantucket and New Bedford, and the intervening places." Now, certainly, it may be fairly presumed, that the public either knew, or were bound to know, what the powers and rights conferred by the charter upon the company were; and the company are to be presumed not to intend to transcend the powers and rights so conferred, or to usurp other functions. Unless then the word "merchandise" in that act, fairly interpreted in its common sense, includes the transportation of bank bills, it is certain that the company had no authority to engage in such business for hire, as common carriers; and the public had no right to contract with

the company for the transportation thereof. The argument, therefore, has been addressed to the court, that bank bills are "merchandise" within the scope and objects and sense of the charter. I confess, that I am unable to accede to the argument. I agree, that the word "goods" may in some connections, (certainly not in all) include bank bills; for the term goods (bona) in the common law has a very extensive signification. So, the word "chattels" may; and a fortiori the word "property," which is of larger signification. Some of the cases cited at bar go to this effect. In Tisdale v. Harris, 20 Pick. 9, it was held, that under the word "goods," in the statute of frauds, the sale of the stock or shares of an incorporated company is included. But the same question has never yet been decided in England; and upon argument, at one time, before all the judges of England, they were divided in opinion upon the point. See Pickering v. Appleby, Comyn, 354; 2 P. Wms. 308; Mussell v. Cooke, Finch, Prec. 533; Long, Sales (Rand's Ed. 1839) pp. 90, 91; 2 Starkie, Ev. (4th Am. Ed.) 608; Id. (2d Eng. Ed. 1833) p. 352; Calye's Case, 8 Coke, 32, 33. In Whiton v. Old Colony Ins. Co., 2 Metc. [Mass.] 1, the same learned court held that "bank bills" were well insured under the word "property," in a policy on time in the coasting trade. In this case the court placed some reliance upon the nature of the business, the insured being the master, as well as the owner, and therefore contemplating various changes of the property from sales and purchases. But at the same time the court admitted that, ordinarily, bank bills are treated as money or cash. In Turner v. Fendall, 1 Cranch [5 U. S.] 117, 133, the supreme court of the United States held, that money (that is, coin or specie) might be taken in execution; and in Handy v. Dobbin, 12 Johns. 221, the supreme court of New York held, that "bank bills" were money, and might be taken in execution. On the other hand, it was held by Mr. Justice Dampier in Thomas v. Royal Exch. Assur. Co. [1 Price, 195] (Man. Dig. "Insurance," B. a, pls. 5, 6; 1 Phil. Ins., 2 Ed., p. 172, c. 5, § 2), that although a policy on goods and merchandise will cover specie dollars, yet it will not cover "bank bills." In Rex v. Beacall, 1 Car. & P. 310, 454, it was held, that an indictment for embezzlement of money, alleged to be the money of certain directors, who were by statute vested with "all goods, chattels, furniture in the house of industry, clothing, and debts," due to the corporation, established by the act, was not sustained by proof, that the money belonged to the corporation; for that the word "goods, chattels," &c. did not include money. Under a bequest in a will of "goods," bank bills and money will pass; and under a bequest of "money" bank bills will pass. But no case can be found, at least as far as my researches extend, in which it has been held, that a bequest of merchandise would include "bank bills." The term

"merchandise" is usually, if not universally, limited to things, that are ordinarily bought and sold, or are ordinarily the subjects of commerce and traffic; and is never applied to choses in action, as bank bills really are. In truth bank bills are ordinarily treated as money or currency, and the phrase "merchandise" is used in contradistinction thereto. The fact, that a thing is sometimes bought and sold is no proof, that it is merchandise. A bond, an annuity, a legacy, a debt due on account, may be bought and sold; but no one would assert any of these things to be merchandise. They would never pass by a grant of merchandise. A sale of all the goods and merchandise in a certain shop would never be presumed as intended to include the personal wearing apparel of the owner, although at the time it might be deposited there. It is said, that bank bills are often bought and sold; that is true; but it does not hence follow, that they cease to be currency and become merchandise. Their primary function, that of currency, gives them their common denomination, and they are, therefore, in the ordinary transactions of life, treated as money. They may, if not objected to, be a good tender in payment of a debt. But no person ever supposed that merchandise, in the ordinary acceptation of the word, could be a good tender. In short, the term "merchandise" is usually applied to specific articles, having a sensible, intrinsic value, bulk, weight, or measure in themselves; and not merely evidences of value, such as notes, bills of exchange, checks, policies of insurance, and bills of lading. In the case of Sewall v. Allen, 6 Wend. 335, the court of errors held that a steamboat charter, authorizing the company to transport "goods, wares, and merchandises," did not necessarily or naturally include the carriage of bank bills, so that, unless the company actually made that a part of their ordinary business of common carriers, they were not liable for any loss thereof. Upon that occasion two of the learned judges, constituting a part of the majority, were of opinion that "bank bills" did not fall within the denomination of goods, wares, or merchandises; and another judge held that although they might fall within the denomination of goods, under certain circumstances, yet that they ought not to be held so in that case, unless that was a part of the ordinary business of the company. My own judgment strongly inclines me to the same conclusion; and the reasoning of the judges of that high court, in support of it, appears to me very cogent and striking. But in the charter now under consideration, the word "goods" is not found. If it were, there might be a more distressing difficulty to be encountered in construing it. 2 Williams, Ex'rs (2d Ed. London, 1838) pt. 3, bk. 3, pp. 854, 855, 861, 862, c. 2, § 4. As it is, I have not been able to persuade myself, that either the corporation or the legislature, under the word "merchandise," meant to include "bank bills," as an object of regular transportation for hire. At all events, if they did, it seems to me, that the word merchandise, ordinarily, has a much more restricted meaning, and in this respect I adopt the doctrine of the court of errors of New York. It is incumbent upon those, who assert, that the charter includes such an expanded meaning, to show by some clear and determinate proofs, that the company have positively adopted and acted upon that meaning. If they had advertised, that they would transport merchandise or freight in their steamboat, it would hardly be pretended, that the public were misled, by supposing, that it included transporting bank bills for hire, unless some unequivocal act of the company established that interpretation beyond controversy. There is no evidence in the present case, that the company ever did intend to receive any bank bills for transportation for hire, or held out such an intention to the public, or ever gave any authority to the master, to receive it on their account. All his acts admit of a very different interpretation, whether the compensation received by him was a gratuity or a price for the service, and are of just such a character as must occur, if he was acting on his own personal account, and at his own personal risk, and for his own personal advantage, or his desire to oblige others. It is no sufficient answer, that the company did not give notice, that they would not be responsible for the acts or negligences of the master, in the carriage of bank bills. Such a notice could be required only in cases, where they had reason to believe, that the master held himself out to the public as entitled to contract on account of the company, or it was an act done within the ordinary scope of their business or employment.

In the view, which I have taken of the law applicable to the present case, and the evidence produced by the parties, it has been unnecessary for me nicely to compare and sift the relative credibility of those of the witnesses, whose testimony is in contradiction to each other, because the facts, which stand uncontradicted, or are supported by an unequivocal weight of evidence, in my judgment satisfactorily dispose of the whole merits. The result to which I have arrived upon a review of the evidence, is, that the company never intended to be common carriers of bank bills for hire; that they never held themselves out to the public in that character; that they never authorized the master to contract on their account for the carriage thereof; that he never intended to do so, or held out to the public that he had any authority; that all the contracts made by him for the carriage of bank bills, were designed by him to be his own personal contracts, and upon his own personal responsibility; that for the most part the services performed by him in the carriage of bank bills were gratuitous; and even when he received any compensation, it was commonly received by him as a gratuity, and not as

a matter of right, although there were some instances to the contrary. That the public generally, although not universally, seem to have understood these to be the mere personal contracts of the master, and not at the risk, or for the account of the company; or, at least, that this was a common impression among many of those who intrusted him with the carriage of bank bills; that the charter of the company does not seem to have contemplated the transportation of bank bills as an ordinary business or employment of the company, even if capable of being construed to include the right so to do, under the term "merchandise;" and, therefore, clear and unequivocal proofs ought to exist, to establish the broader construction on the part of the company, before they should be affected with liability therefor; and, finally, that in this case there are no such proofs. Under such circumstances, it seems to me that the decree of the court below, dismissing the libel, ought to be affirmed. In delivering this opinion, I have studiously abstained from deciding, whether the master in this case was guilty either of gross or of ordinary negligence, in the loss of this package of bank bills, because that question may yet arise, and be brought directly in judgment in a suit against the master. I feel, however, bound to say, that if I had been entirely satisfied, that the master was not guilty either of gross or of ordinary negligence, I should have been spared the many other laborious inquiries, to which this opinion has been addressed. It is the doubt on this head, brought to my mind, which has compelled me to go at large into all the other grounds, upon which I hold the company absolved, even if the master was guilty either of gross or of ordinary negligence.

In the course of the argument it was intimated, that in libels of this sort, the proceedings might be properly instituted both in rem against the steamboat, and in personam against the owners and master thereof. I ventured at that time to say, that I knew of no principle or authority, in the general jurisprudence of courts of admiralty, which would justify such a joinder of proceedings, so very different in their nature and character, and decretal effect. On the contrary, in this court, every practice of this sort has been constantly discountenanced, as irregular and improper. The case of The Triune, 3 Hagg. Adm. 114, was cited at the bar, in support of the right to join the proceedings. That case is very imperfectly reported. But it appears that the original proceeding was in rem against the ship, for a collision, and that Wardell, who was the master, and also the principal owner, and to whose negligence the libel attributed the collision, alone appeared in the suit. By the statute of 53 Geo. III. c. 159, the owners, when the loss has been without their fault or privity, are not liable beyond the value of their ship and freight; but the owners, who are in fault, and the master also, are liable to full damages to the extent of the injury done to the other party. No bail was given. The freight was brought into court, the ship was sold, and the proceeds falling short of the damages by £400, a monition issued against Wardell to pay that sum, which failing to do, he was imprisoned upon an attachment, moved for and granted by the court. Now, it is apparent, that there was a great peculiarity in this case, Wardell being the sole party, who intervened, and being by the statute liable for the full damages. A monition issued before the attachment was granted; and if that monition was preceded by a supplementary libel, or act on petition, stating the facts of the sale of the ship, and the deficiency to pay the damages, the proceeding was clearly regular and right. But if no preliminary proceeding was had, I confess that I do not well see how a proceeding, originally in rem, could be prosecuted in personam against a party, who in such proceeding intervened only for and to the extent of his interest. Probably there were other circumstances which varied the general rule. At all events, I am not prepared to accede to the authority of this case, if it is to stand nakedly, and only upon the circumstances above stated. In cases of collision, the injured party may proceed in rem, or in personam, or successively in each way, until he has full satisfaction. But I do not understand how the proceedings can be blended in the libel. The case of The Richmond, 3 Hagg. Adm. 431, is a case more conformable to my notion of the practice. But there the ship was not arrested; and the proceedings were in personam against the owners.

On the whole, I am of opinion that the decree of the district court ought to be affirmed; but as the appeal seems to me, under all the circumstances, in a case of such novelty and intricacy, to have been fully justifiable, I should have inclined to award that one half of the respondents' costs in this court should be borne by them, and the other half should be borne by the libellants, if it could have been done without breaking in upon the settled practice of the court. As it is, the respondents must take their full costs.