HON. J. G. TALIAFERRO, ⎫
HON. R. K. HOWELL, ⎪
HON. W. G. WYLY, ⎬ *Associate Justices.*
HON. W. W. HOWE, ⎭

---

No. 2320.—THE ECLIPSE TOWBOAT COMPANY *v.* THE PONTCHARTRAIN RAILROAD COMPANY.

In the rule that "every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it" (Rev. C. C. 2315), the phrase "every act" is controlled by the word "fault," and it results that the party bound must be in fault, that is to say, his conduct must be, in the general sense of the word, unlawful.

No one can be held liable for the regular and prudent exercise of a right that belongs to him, (L. 55, *ff. de reg. juris,*) and he alone causes a legal injury who does what he has no right to do. (L. 151, *ff. de reg. juris.*)

The defendants, owning a short railway, from New Orleans to Lake Pontchartrain, and one Morgan, owning a line of steamers plying from the Lake terminus to Mobile, and the plaintiffs and other parties owning two other steamers in the same trade, an arrangement was made by defendants with Morgan, and, temporarily, with the proprietors of the other steamers, respectively, to share *pro rata* the through freight from New Orleans to Mobile. It appeared that this arrangement was unprofitable to the defendants, for the lines of steamers, by competing and lowering the rates of freight, greatly reduced the share coming to the railway. The defendants therefore entered into an agreement with Morgan by which the latter loaned them $250,000, and the former agreed to pro rate with him the through freight from New Orleans to Mobile, and to charge all other steamers the tariff rates paid by the public generally. The plaintiffs immediately laid up their steamer and sued for damages, on the ground that this prorating with Morgan and refusing to further pro rate with plaintiffs was an illegal combination with Morgan to confer on him an unlawful monopoly and preference.

*Held*—That the acts of defendants were not in contravention of any statute of Louisiana or any principle of her jurisprudence; that they might agree or refuse to pro rate through freight with anybody, and the plaintiffs could not complain of a refusal to pro rate with them; and that, as common carriers, in the absence of statutory prohibition, their acts in the premises were not unlawful.

APPEAL from the Seventh District Court, parish of Orleans. *Collens, J. Elmore & King*, for plaintiffs and appellants, *Bradford, Lea & Finney*, for defendants and appellees.

Mr. W. W. King, one of the counsel for plaintiffs and appellants, made the following argument in this case before the Supreme Court:

### ORIGIN OF THE SUIT.

In October, 1865, certain parties purchased the steamer Creole, with five other vessels. They gave $16,000 for the Creole. This vessel was immediately put in the trade between New Orleans and Mobile, touching at the watering places on the lake. She continued in that trade three months and twelve days.

The earnings of the vessel during that time were $50,821 54. Her expenses were about $8000 per month, not including repairs; showing a net profit of $23,621 54.

About the ninth of March, 1866, she was put into trade between New Orleans and the watering places across the lake. She continued in that trade until the twenty-eighth of August. She was then withdrawn to undergo repairs. During that interval her gross earnings were $48,850 50; her expenses about $34,000; showing a clear profit of $14,850.

In April, 1866, the parties who had purchased the Creole and other vessels formed themselves into a corporation, and transferred the said vessels to the corporation, the transferree assuming all debts, and taking the vessels at the original costs. The present plaintiffs are that corporation. The vessel was laid up for repairs about seven months. About the ninth of March, 1867, she was put into the summer trade between New Orleans and the lake shore places. During this time there had been expended upon the vessel for repairs the sum of $75,590 59.

In the early part of the summer season of 1867, the Creole was running profitably, until the Morgan line commenced reducing the fare in July.

The previous price had been four dollars to all places except Pascagoula, and five dollars to that place. These prices were reduced by the Morgan line to fifty cents and one dollar. The object of this reduction was to starve out all competition against the Morgan line. The result of this summer's campaign and race of competition was that at the end of the season the Creole had made over $3000, and the Laura, the competing boat of the Morgan line, lost in running expenses over $21,000, exclusive of repairs. Her repairs alone were estimated at $10,000 or $12,000.

On the seventeenth of April, 1866, Charles Morgan entered into a contract with the Pontchartrain Railroad Company, in which it was stipulated that he "or his agent shall during the said term (i. e., five years), have the right to charge such prices for carrying freights between New Orleans and Mobile or intermediate ports as they may deem best for the mutual interests of the parties; and the Pontchartrain Railroad Company, for its services thus performed, shall be entitled to charge and collect from the said Charles Morgan or his agent, instead of detailed freight charged by the tariff as heretofore, one-quarter of the total amount of freight moneys which the said

steamers may charge for freights thus mutually carried by the parties hereto."

The operation of this contract upon the railroad is very well described by the railroad superintendent at page 227 of the record. Other boats were allowed the same privilege. A very lively competition sprung up among them, which led to a reduction of freight from fifty cents per barrel to fifteen cents, and reduced the share of the railroad from twelve and one-half cents to three and three-fourth cents per barrel. Mr. Morgan did not succeed in driving off his competitors by means of the contract, and both he and the railroad company were doubtless disappointed in the result. A new contract was entered into about the first of November, 1867, in consequence of which, Mr. Pandelly, the superintendent of the railroad, issued to the plaintiffs the following notice:

"NEW ORLEANS, November 2, 1867.

Peter Marcy, Esq., Agent Steamer Creole:

SIR—I am instructed to notify you that on and after the fifteenth instant all freight transported by this road from and to the steamer Creole will be charged for in accordance with the company's tariff, a copy whereof is herewith transmitted.

Respectfully, G. PANDELLY, General Superintendent."

A similar notice was sent to the captain of the Camelia, the only other boat competing with the Morgan line.

The tariff which accompanied these notices increased immensely the rate of freight charged by the road. Instead of three and three-fourths cents per barrel, the price was raised to twenty-five cents, which was ten cents more than the whole freight charged by the boats, including the one-fourth previously given to the railroad.

This last contract between Morgan and the Pontchartrain Railroad Company, though made about the first of November, 1867, was not reduced to writing before the notary until the twentieth of January, 1868. By this contract, Mr. Morgan bound himself to lend the railroad company two hundred and fifty thousand dollars, and the contract contained this stipulation:

"And the said appearers further declared that it has been and is hereby agreed and stipulated between them, that although the company may hereafter receive and deliver at the proposed new depot on the levee the whole or a part of the freight shipped to or brought by Mr. Morgan's lake steamers, yet the company's proportion of the freight earnings of said steamers shall be unchanged during the continuance of the contract entered into between him and the company on the seventeenth day of April, 1866. The company is to charge all outside boats running to and from the lake end (except those running to and from the North Louisiana shore) present tariff rates."

The plaintiffs had intended putting the Creole in the Mobile trade, as she had usually been employed in the winter season, merely touching at the places on the lake shore.

As freight was the principal part of the Mobile trade, it was impossible for the Creole to run under the disadvantages imposed upon her by the railroad, under the unfair discrimination in favor of Morgan, without an inevitable loss of money. The lake trade alone, in the winter, was not sufficient to justify her running exclusively in that trade, even had there been no discrimination against her. She had been built and fitted up expressly for the navigation between New Orleans and Mobile, and was suited for no other trade. Consequently when driven from that trade she had to lie up at New Orleans, and became an almost total loss to her owners.

The present suit was brought for damages thus incurred.

### MONOPOLY CREATED.

The defendants deny that the contracts between Morgan and the Pontchartrain Railroad Company were made with the view of giving Morgan an undue preference, or of creating a monopoly. We think the foregoing statement of facts, established indubitably by the evidence of record, disproves beyond doubt the truthfulness of these denials.

It is urged by the defense that there was nothing in the contracts which prevented the Creole running.

It is true there is no express prohibition to this effect. But things may often be accomplished by indirect means as effectually as by direct. A law prohibiting, under serious penalty, all persons but one from following a certain occupation, would confer as complete a monopoly as a law giving that favored person the exclusive privilege of following that occupation. So persons may be put under disadvantages in following certain pursuits, with regard to others, which would thereafter render the occupation utterly impracticable in a business point of view. This result is obtained when it is certain a business can not be followed without serious pecuniary loss. The loss which the plaintiffs would have incurred by continuing to run the Creole was of this character. They could not pursue their business without incurring a penalty too heavy to make the trade profitable. The discrimination against them operated as a penalty and rendered their further prosecuting their business just as impossible as if it had been expressly prohibited by law, or by the contract between Morgan and the railroad company. The business a man can not follow without inevitable loss is just as much prohibited in every practicable view as if forbidden by imperial decree.

It is next contended that the plaintiffs should have run the Creole and then brought suits to recover back the money illegally exacted by the railroad company. Suppose the plaintiffs had done so, and at the end of each trip had brought suit, and had so continued for years until the legality of the charges were tested, would not the necessity for this course have been an intolerable grievance? Would not the lawyers' fees and the time lost and annoyance experienced have rendered this an inadequate relief, even if the money wrongfully exacted had been recovered back?

These exactions were not for a single instance. They were demanded for every trip of the boat until the law settled the right. How long a time would this have probably required, and how much money must have been advanced during the time to have tested this desperate experiment of recovering back money illegally exacted? It is probable it would have required years of time and an outlay of money, tens of thousands of dollars. Is it to be presumed that every person thus injured could have made the necessary advances? The proposition is simply this: A man in the honest pursuit of a lawful business is met by another party who demands of him an illegal exaction daily for permission to carry on his business. Further, suppose he has the power to stop the business unless the demand is satisfied? Is it possible that the law affords no relief to the party thus injured but to pay the illegal demand, and then sue to recover back the amount so illegally exacted? It would be a very lame and impotent administration of justice that would sanction any such doctrine.

Our adversaries allege they never refused to take any freight offered to them for the Creole.

After Mr. Paudelly's note, it would have been a very useless and idle ceremony for the Creole to have asked permission to continue

shipping freight upon the same terms extended to Mr. Morgan. This note was an active violation of the obligations of a common carrier, and no formal putting in default was required.    C. C. 1926 ; R. C. C. 1932.

Does any one suppose that after the notice was given Mr. Pandelly would have delivered freight to the Creole without the payment of the rates charged ?  If any such delusion should be indulged it argues but little acquaintance with corporations and their modes of doing business.

The special defenses set up in the answer are unfounded in law or in reason, and are themselves a tacit admission of the causes of action alleged in the petition.    After a review of the facts already stated, and many others in the record, we think no candid mind can fail to come to the conclusion that the contracts between Charles Morgan and the Pontchartrain Railroad Company were intended to confer upon him a monopoly, not only of the railroad, but also of the navigation between New Orleans and Mobile and the intermediate places.    That those contracts did so operate, is conclusively shown by the evidence.

The Creole was driven out of the trade and left to rot at her moorings below New Orleans.

### THE MONOPOLY JUSTIFIED.

The defendants next justify the monopoly created by their acts, by alleging it was "for the promotion of the interests of the public as well as the railroad."

We do not deny that the railroad company may have made a temporary profit by a sale of the rights of the public to Morgan.    It is, however, a sufficient answer to this branch of the allegation, that the railroad possessed no such power under its charter.    It was authorized by the Legislature to construct the railroad for the producing "great advantages and benefits to the said city and State generally," and not for making a pecuniary speculation by selling exclusive privileges to a particular individual.    The sovereign power may, for great public motives, confer exclusive privileges, but no such power is vested in the Pontchartrain Railroad Company.

As for the other part of the allegation, we can not conceive how the public can be benefited by giving Mr. Morgan the exclusive use of the railroad and of the navigation between New Orleans and Mobile.    As for the manner in which Mr. Morgan used this power, Mr. Perkins has informed us.    He states that as soon as the Creole was driven out of the trade, the Morgan line raised the rates of freight and passage fare to what it had been before the reductions commenced, which were produced by the competition between the boats.    That Mr. Morgan, when once in the undisputed possession of his monopoly, with all competition overcome, wou'd have used his power to his own best advantage, is as certain that self-interest is a leading actuating motive in the character of man.    To suppose to the contrary would contradict history and all human experience.

If our adversaries can succeed in establishing that the destruction of all competition by conferring exclusive rights and monopolies on particular individuals is conducive to the public interests, they will certainly be entitled to a patent for their new discovery in political economy.    They will convert that into a benefit and a blessing which in all times past has proved a bane to public prosperity.

By the laws of England, monopolies were regarded and punished as crimes.  Blackstone, in his chapter of offenses against public trade, says of monopolies: "These had been carried to an enormous height in the reign of Queen Elizabeth ; and were heavily complained of by Sir Edward Coke in the beginning of the reign of James the First ; but

were in a great measure remedied by statute 21, Jas. I., C. 3, which declares such monopolies contrary to law and void,        *        *        *
and monopolies are punished with the forfeiture of treble damages and double costs to those whom they attempt to disturb." Vol. IV., chapter 12, page 159.

That monopolies created by private individuals or corporations, combinations in restraint of trade, or to prevent fair public competition, are unlawful, are against public policy, and are immoral, has been so often declared we regard argument on the point to be unnecessary. We will simply refer to the following authorities: Rev. C. C., 1892, 1895, 1847, sec. 12; Old C. C., 1886, 1889, 1841, sec. 12; Hen. Dig., 1007, sec. 6, p. 1008, sec. 9; India Bagging Association v. Kock, 14 A. 168; Piron v. Back, 10 A. 13; Merchants' Insurance Company v. Addison, 9 R. 486; 1 Story's Eq., p. 289, No. 292; Drury v. Cross, 7 Wallace, p. 305; 2 Redfield on Railways, p. 70, note 15; Sanford v. Catawissa & W. & E. R. R. Co., 2 Philadelphia Report, p. 132; Merlin, verbo Monopole, p. 397, sec. 4; Journal du Palais for 1857, p. 259; 1858, p. 618; 1859, pp. 747, 1011.

We do not understand the defendants seriously to contest the truth of the general doctrine above laid down. They seek to avoid its effect by establishing certain exceptions to the general rule, and placing their case within those exceptions.

They have introduced a mass of testimony for the purpose of showing that, in this particular instance of monopoly, the public have sustained no injury, on the contrary, have been benefited. If they established the facts as attempted, which we deny, it could not avail them in their defence. C. C., article 19: "When to prevent fraud, or from other motives of public good, the law declares certain acts void, its provisions are not to be dispensed with on the ground that the particular act in question has been proved not to be fraudulent, or not to be contrary to the public good."

It might be true, that during the pendency of this suit, or in the incipiency of his monopoly, as at the time the testimony was taken, Mr. Morgan would have carefully avoided arousing public indignation by abusing the power given him; but does this prove that he never will, or that monopolies are right and legal?

The defendants also virtually assume that if the public generally were benefited by the monopoly that it was immaterial how much the plaintiffs were injured. This was charged by the judge of the district court, saying in such a case it was "*damnum absque injuria*," i. e., a loss without injury to the law, or for which the law afforded no relief.

The question presented is simply this: a party in the pursuit of an honest and lawful trade, without any fault or crime of his own, can be driven from his trade, and all the property he had necessarily used in that trade •destroyed, without any compensation therefor, if in the opinion of the judge the public suffered no injury thereby. We had been taught to believe, under the Constitutions of both the United States and of the State, that vested rights could not be divested, even by the sovereign authority, without adequate compensation, and that no man could be deprived of his life, liberty or property without due process of law. That which the highest sovereignty known in this country could not do, this petty railroad corporation claims the right to do.

### DISCRIMINATIONS BY RAILROADS.

The defendants contend that railroads may make certain discriminations, and that the one made in favor of Morgan is not illegal.

The subject of what discriminations may be made by railroads is admirably discussed in note 15 to page 70 of 2 Redfield on Railways.

The following extracts from that note will sufficiently show that the defendants' case does not come within any of the discriminations that may be legally made:

Page 72, "A railway company who advertised for carrying a certain description of goods at a lower. rate of charge, when sent through certain agents, was restrained by injunction from making any such reduction."

Page 73, "Railway companies may discriminate by classes, in regard to freight or passengers, but their charges must be uniform to all persons."

Pages 74, 75, "It was decided that it was competent to a railway company to enter into special agreements, whereby advantages may be secured to individuals in the carriage of goods upon the railway, where it is made clearly to appear that in entering into such agreements the company *have only the interests of the proprietors and the legitimate increase* of the profits of the company in view, and that the consideration given to the company in return for the advantages afforded to them is adequate, and the company are willing to afford *the same facilities to all others upon the same terms.*"

In making the contract with Morgan, the railroad did not do so only for the interests of the company. Morgan was also to be greatly benefited. It was not made for the purpose of conducting the legitimate business of the railroad. It was made in consideration of a loan of money. The railroad company expressly bound themselves not to extend the same facilities to others.

The above principles are taken from both the English and American decisions. Our law, on general principle, as emphatically prohibits these discriminations as the English statutes do. Even in the absence of any express statutes to that effect, the law has been so declared in the case of Sanford *v.* Catawissa and W. and E. Railroad Company, 2 Philadelphia R. 132.

We give the extracts below as conclusive upon the case:

"The supposed necessity for such provisions in charters granted in this country and in England, proves nothing more than that the lawmakers in both countries were aware of the difficulty of holding large corporations to those common obligations of justice which individuals feel bound to acknowledge without legislative enactment."

*     *     *     "The answer and the evidence show the railroad company is willing to carry the express matter of Howard & Co. in their freight trains, which go at less speed than the passenger trains, but that its purpose is to give to the International Express Company, the exclusive privilege of transportation in their passenger trains. The railroad corporation has no right to do this. The power to regulate the transportation on the road does not carry with it the right to exclude any particular individuals or to grant exclusive privileges to others. Competition is the best protection to the public, and it is against the policy of the law to destroy it by creating a monopoly in any branch of business. It can not be done except by the clearly expressed will of the legislative power. Limited means may perhaps limit the amount of business done by a railroad company, but it can never furnish an excuse for appropriating all its energies to any particular individual. If it possessed this power, it might build up one set of men and destroy others—advance one kind of business and break down another, and might make even religion and politics the tests in the distribution of its favors. Such a power in a railroad corporation might produce evils of the most alarming character. The rights of the people are not subject to any such corporate control." *     *     *

"A regulation to be valid must operate on all alike. If it deprives

any person of the benefits of the road, or grants exclusive privileges to others, it is against law, and void."

The only authority our adversaries have been able to quote as favoring their views, is the Fitchburg Railroad Company *v.* Guge et al., 12 Grey 393.

This was a case in which the plaintiff complained that ice was charged more freight than bricks. The court will at once perceive that this does not conflict with the foregoing authorities.

The case was decided under the statute laws of Massachusetts, and there is nothing in it which warrants the conclusion that railroads may make discriminations for the purpose of giving certain persons peculiar advantages or monopolies.

### VIOLATION OF CHARTER BY RAILROAD.

It will be seen by a comparison of the charter of railroad company (section 9, page 292 of record, with the tariff of charges; record, page 52) that the company, in their contract with Morgan, bound themselves to charge other boats a sum far exceeding that allowed by the charter.

By the charter the railroad was limited to fifty cents per ton. This would be five cents per barrel on flour, allowing ten barrels to the ton. By the tariff demanded of the plaintiffs, flour was twenty-five cents per barrel, an increase of five times the legal rate. Other articles mentioned in the tariff were increased in the same proportion. This was a flagrant violation of the charter, and rendered the contract unlawful.

Upon this ground alone, independent of what we have previously urged, the plaintiffs are entitled to recover all the damages they sustained in consequence of the contract, and the monopoly it created.

Having thus, we think, demonstrated the illegality of the contract between the railroad company and Morgan, we shall proceed to consider the liability of the company for the damages caused by their unlawful acts.

Having disposed of all the objections urged against our right to recover any damages, we will now proceed to consider the amount to which we are entitled.

### THE MEASURE OF DAMAGES.

The defendants contend that our suit is one for damages for the violation of a contract either express or implied, and that rules regulating the damages in such cases govern this suit. The judge of the district court charged the jury the rules which govern damages for violation of contracts, and that exemplary damages could not be allowed.

We, on the contrary, contend that the action is plainly one for a quasi offense. It is a suit for damages we have suffered from the fault of the Pontchartrain Railroad Company. C. C. 2294; Rev. C. C. 2315. We charge that the acts of that company which injured us were unlawful; were against public policy, and were immoral.

Our suit is not for damages for the violation of any express contract or quasi contract. Both the allegations in the petition and the proof in the record establish a quasi offense. There is no pretense on our part of there having been an express contract in the case. The action then must be either one on *quasi* contract or one for a *quasi offense.*

The distinction between the two is plainly enough marked in the Civil Code.

" Quasi contracts are the lawful and purely voluntary acts of a man, from which there results any obligation whatever to a third person." C. C. 2272; Revised C. C. 2293.

The Eclipse Towboat Company v. The Pontchartrain Railroad Company.

There are two principal sources which give rise to quasi contracts: "The transaction of another man's business, and the payment of a thing not due." C. C. 2273; Revised C. C. 2294.

Quasi offenses are thus defined (C. C. 2294; Revised C. C. 2315): "Every act whatever of man that causes damages to another, obliges him by whose fault it happened to repair it."

Pothier says: "These differ from quasi contracts, inasmuch as the subject of a quasi contract is permitted by law, whereas the fact which forms a delictum is something reprehensible."

Are combinations to create monopolies contracts against public policy and immoral contracts lawful, or are they reprehended by the law? We think the question too clear for argument. The charge of the district judge was erroneous, and misled the jury.

### RULES FOR ASSESSING DAMAGES FOR QUASI OFFENSES.

C. C. 1928, Rev. C. C. 1934, section 3: "Although the general rule is that damages are the amount of the loss the creditor has sustained, or of the gain of which he has been deprived, yet there are cases in which damages may be assessed without calculating altogether on the pecuniary loss or the privation of pecuniary gain to the party." * * * * "In the assessment of damages under this rule, as well as in cases of offenses and quasi offenses and quasi contracts, much discretion must be left to the judge or jury."

This rule has been applied by our courts to a very great variety of actions, where the damages could not be established with accuracy. For instance, in actions for libel, slander, trespass, all kinds of torts, where a child sues for the killing of the father by public carriers, and such cases generally. In none of these cases could the damages be proved with certainty.

The courts have further recognized the right to inflict punitory or exemplary damages in a great number of instances, and in some where none could be proved. There never was, perhaps, a case more imperatively calling for exemplary damages than the one now before the court. Corporations chartered for the public generally should be severely taught not to use their franchises for the making of monopolies. We here append a list of some of the cases in which the foregoing principles have been maintained: McGarcy v. City of Lafayette, 12 R. 678 et seq.; Frank v. Carrollton Railroad Company, 20 An. 25; Pyke & Co. v. C. Doyle & Co., 19 An. 362; Fellows v. High, 7 An. 452; Steinson v. Buisson, 17 L. 567; Grant v. McDonogh, 7 An. 447; Hen. Dig. verbo Libel and Slander; Dyke & Aurlburt v. Walker, 3 An. 69.

Pothier, after stating the rules applicable to damages for violation of contracts, says these principles do not apply to cases of fraud, "for a person who commits a fraud obliges himself, velit nolit, to the reparation of all the injury which it may occasion; for instance, if a person sells me a cow which he knows to be infected with a contagious distemper, and conceals this view from me, such concealment is a fraud on his part which renders him responsible for the damages that I suffer, not only in that particular cow, which is the object of the original obligation, but also in any other cattle to which the distemper is communicated, for it is a fraud of the seller which occasions this damage." Pothier I. C. 2, art. 3.

By our Civil Code damages from fraud or quasi offenses are classed together, as being governed by the same rules. C. C. 1928, sec. 3.

Taking the foregoing rules for our guide in assessing the damages we are entitled to claim, let us apply them to the case to ascertain as nearly as possible the amount of damages due to plaintiffs.

### AMOUNT OF DAMAGES.

Taking it for granted that the court will award damages sufficiently serious to prevent a repetition of the offense, and that the plaintiffs will be restored to the undisturbed possession of their legal rights, we will make our calculation upon that basis.

If we exclude from the calculation an estimate of the loss of gain, although the Civil Code expressly sanctions the claim, and take another basis of calculation, we shall find the following result:

| | |
|---|---:|
| Interest at eight per cent. on the cost of the Creole, $91,000 for three years | $21,800 |
| Depreciation on the value of the vessel, ten per cent., per annum for three years | 27,300 |
| Loss in summer 1868 | 1,080 |
| Expenses when lying up | 7,300 |
| Lawyer's fees | 2,500 |
| Time, trouble, etc., attending to suit | 2,000 |
| Amount of loss | $61,980 |

The plaintiffs know they have been damaged to a very large amount. We ask the Court to award them such damages as will to some extent reimburse them for the very serious losses they have sustained, or tell us plainly that the combination between the defendants and Morgan, and monopoly conferred thereby, was lawful and proper.

HOWE, J. The plaintiffs alleged themselves to be the owners of the steamboat Creole, a vessel built for the Mobile and lake trade. They charged that the defendants had "entered into an alleged combination with one Charles Morgan to deprive the public generally of the benefits of said railroad, with the view of conferring on the said Morgan a monopoly of the freight and passengers transported over the said railroad, making an unjust and illegal discrimination in his favor in the price charged by the railroad for the transportation of · freight and passengers. Further, that said combination was also intended to confer upon the said Morgan a monopoly of the carrying of freight and passengers by means of the navigation of the waters by vessels running between New Orleans and Mobile, and the various places situated on the shores of the lakes."

That an undue and unlawful preference was made in favor of Morgan, and that by reason of this and the other facts and figures recited in their petition, they have suffered damages in the sum of $100,000.

The defendants answered by a general denial; by a special denial of any undue preference or monopoly; that the arrangement complained of was made to secure at all seasons the services of an efficient and reliable line of steamers in connection with their terminus on the lake, and was made in good faith and for the promotion of the interest of the public, as well as of themselves.

They denied any notice of plaintiffs' desire to put the Creole into the Mobile trade, any exclusion of her from a connection with the

railroad, or any refusal to carry freight for her, and averred that the withdrawal of the Creole from the trade, prior to the commencement of the suit, was a voluntary and prudent retirement from a losing trade during the winter season, and was not productive of any loss or damage to the plaintiffs.

The plaintiffs prayed for a jury of merchants, and the trial before such jury resulted in a verdict in their favor for the nominal sum of $100, and plaintiffs alone appealed.

There is no proof of any of plaintiffs' allegations in regard to carriage of passengers, and that branch of their complaint may be dismissed.

As to the carriage of freight, it appears that on the seventeenth April, 1866, Morgan entered into a contract with the railroad, by which it was stipulated that he "or his agent shall, during the said term" (i. e., five years), "have the right to charge such prices for carrying freights between New Orleans and Mobile or intermediate ports as they may deem best for the mutual interests of the parties; and the Pontchartrain Railroad Company, for its services thus performed, shall be entitled to charge and collect from the said Charles Morgan or his agent, instead of detailed freight charged by the tariff as heretofore, one-quarter of the total amount of freight moneys which the said steamers may charge for freights thus mutually carried by the parties hereto."

No complaint is made of this agreement. The plaintiffs made the same for their boat, the Creole, and the same was entered into with the steamer Camelia.

The defendants, however, found that this arrangement did not work well for them. The price of freight charged by the Creole, for example, in April, 1866, was fifty cents a barrel, of which the railroad received twelve and one-half cents. During the summer she put her price down to fifteen cents, as did the other steamers, and the railroad got but three and three-fourths cents. They therefore made a new arrangement, and about the first November, 1867, agreed with Morgan that he should loan them $250,000, for the purpose of extending their road up the levee and building new depots, and they in turn would continue the arrangement for dividing through freight only with him; charging other steamers the regular tariff rates, as charged to the rest of the public. This stipulation was embodied in the act of mortgage to secure the loan, as follows:

"And the said appearers further declared that it has been and is hereby agreed and stipulated between them, that although the company may hereafter receive and deliver at the proposed new depot on the levee the whole or a part of the freight shipped to or brought by Mr. Morgan's lake steamers, yet the company's proportion of the

freight earnings of said steamers shall be unchanged during the continuance of the contract entered into between him and the company on the seventeenth day of April, 1866. The company is to charge all outside boats, running to and from the lake end (except those running to and from the north Louisiana shore) present tariff rates."

On the second of November, 1867, the defendants notified the agent of the Creole that on and after the fifteenth of that month all freight for her would be charged tariff rates. On the tenth of November, 1867, the Creole was laid up, and on the twelfth February following this suit, with its enormous claim for damages, was begun.

The Creole was sixteen years old at this time. Her cost to plaintiffs was $35,000; her tonnage 396 tons. Morgan placed on the route three steamers; aggregate tonnage, 2800 tons, and cost $585,000.

We do not find that the defendants have joined in the appeal, and the judgment must, therefore, stand unless the plaintiffs are entitled to have its amount increased in accordance with the claims they make in their petition and the views of the law they have urged in their argument.

The plaintiffs sue, of course, in enforcement of some supposed legal obligation, and the question at once presents itself whether any such obligation exists. It is not pretended that it springs from any contract or quasi contract or from the operation of the law. It must, therefore, result, if any existence it have, from some offense or quasi offense committed by the defendants—from some injury or neglect on their part. But as neglect is evidently out of the question, we must conclude that the alleged obligation springs from a supposed offense and that the plaintiffs claim under that general principle expressed in article 2315 Rev. C. C., that "every act whatever of man that causes damage to another obliges him by whose *fault* it happened to repair it."

There is no room for doubt at the present time as to the meaning of this language. It is copied literally from the Code Napoleon and has been the subject of numerous decisions and abundant commentary. The phrase "every act" is controlled by the word "fault," and it results that the party bound must be in fault; that is to say his conduct must be, in the general sense of the word, unlawful. No one can be held liable for the regular and prudent exercise of a legal right that belongs to him. He does not commit a fault by making use of a right. *Nullus videtur dolo facere qui suo jure utitur*. L. 55, ff. de reg. jur. And he alone causes a legal inquiry who does what he has not a right to do. *Nemo damnum facit, nisi qui id facit quod facere jus non habet*. L. 151, ff. de reg. jur. These principles are elementary, and we merely paraphrase the language of the jurists from Gaius and Paulus down to the latest commentator.

And these principles are especially applicable to the competitions of modern commerce. "To him that hath shall be given, and from him that hath not shall be taken away even that he hath." One man by rare powers of combination acquires capital, and by its use builds up a business which dwarfs and finally kills the trade of his less fortunate neighbor. We may pity the weaker merchant, but we can not mulct the stronger one in damages. The great law of "natural selection" is something we can not repeal, and "the fittest survive," and always will.

The case is narrowed, then, to the inquiry whether there was anything unlawful and legally injurious to plaintiffs in the agreement made by the Pontchartrain Railroad Company with Charles Morgan, by which, in the language of their trade, they "pro rated" the through freight with him to and from New Orleans and Mobile, and declined to further pro rate with plaintiffs. We can not perceive anything illicit in this agreement. The plaintiffs do not pretend that the railroad charged them, or the public generally, too much, but that it charged Morgan too little. What law did they violate in so doing? No statute of Louisiana has been infringed; none is quoted by appellants except the charter of the company, and that is silent on the subject. No rule of jurisprudence has been violated, so far as we can perceive. The company is a juridical person; its special business is to make contracts in regard to freight, and what is there to prevent it from making an agreement by which a large loan is secured to enable it to extend its road and build its depots, and by which a daily line of fine steamers is secured to connect its short route with the great highways to the East and North? And what is there to prevent its declining to "pro rate" with the Creole and Camelia, when it found that the effect of prorating with several lines was to enable them to engage in the game of competition at the railroad's expense?

The plaintiffs never offered to loan the railroad a quarter of a million of dollars, or any other sum; the plaintiffs never offered to establish a daily line of large swift steamers; they call their own vessel the "poor little Creole." Why should they complain, then, if the company chooses to avail itself of the great advantages offered by Morgan? But above all, why should they complain if the railroad refuses to "pro rate" with them when it is not bound to pro rate with any one?

The plaintiffs cite, as in their favor, a number of cases recently decided in the English courts, and particularly those collected in the note 15 to page 70 of volume 2, Redfield on Railways. But these decisions were made under the stringent provisions of railway traffic acts of Parliament, and, as has been remarked by the Supreme Court of Massachusetts, (12 Gray, 398,) "throw very little light upon questions concerning the general rights and duties of common carriers." Yet even with the peculiar and stringent provisions of the English

legislation on the subject, it has been there decided that "it is competent to a railroad company to enter into special agreements whereby advantages may be secured to individuals in the carriage of goods, where it is made clearly to appear that in entering into such agreements the company have only the interest of the proprietors and the legitimate increase of the profits of the company in view, and that the consideration given to the company in return for the advantages afforded is adequate, and the company are willing to afford the same facilities to all others upon the same terms." Redfield on Railways, volume 2, pages 74, 75, citing Nicholson v. G. W. Railway, 5 Com. Bench, N. S. 366.

The better opinion seems to be, that in the absence of special statutes a railway corporation is in the matter of freight contracts governed by the general law of common carriers. Redfield on Railways, volume 2, page 117; Sewell v. Allen, 6 Wend. 335; Citizens' Bank v. Nantucket Steamboat Company, 2 Story 16; Fitchburg Railroad Company v. Gage, 12 Gray, 393.

In the last case, which is directly in point, the Supreme Court of Massachusetts said of the common law in regard to carriers: "The principle derived from that source is very plain and simple. It requires equal justice to all. But the equality which is to be observed in relation to the public and to every individual consists in the restricted right to charge in each particular case of service a reasonable compensation, and no more. If the carrier confines himself to this, no wrong can be done, and no cause afforded for complaint. If for special reasons, in isolated cases, the carrier sees fit to stipulate for the carriage of goods or merchandise of any class for individuals for a certain time, or in certain quantities, for less compensation than what is the usual, necessary and reasonable rate, he may undoubtedly do so, without thereby entitling all other persons and parties to the same advantage and relief."

On the whole, we see no reason to increase the judgment in this case.

Judgment affirmed.

———

TALIAFERRO, J., *dissenting*. I am of the opinion the plaintiff ought to recover damages. The judge's charge to the jury, I think, is in regard to an important point erroneous, and I make no doubt the jury was misled by it. The Pontchartrain Railroad Company, as its charter shows, is vested with large powers and advantages. It virtually has a monopoly in the transportation, both ways, of all merchandise passing between the lake and New Orleans. Everything entering into the important commerce between that city and Mobile must necessarily go over their road. I consider that this company, endowed by the Legislature with such large privileges, is impliedly bound to the

community at large to deal fairly with all who are interested in the extensive business it is engaged in as a public carrier. This implied obligation has not, in my view, been complied with. I find from the evidence in the record that prior to the fifteenth of November two or three years, a strong competition existed between what is called the Morgan steamers and others on the lake, and among them the Creole, belonging to the towboat company, the plaintiffs in this case. I find it in proof that up to the time mentioned the Creole withstood this competition, and with less detriment therefrom than the boats of the Morgan line. It is shown that the company published a tariff of prices for the carriage of goods, to go into operation on the fifteenth of November, 1867. All were required to pay the prices so fixed, *who did not ship* to and from the lake terminus of the railroad by the Morgan line of steamers; but those who did ship by the Morgan line were not required to pay them, and were charged vastly less for their transportation. The discrimination was very large, and evidently intended by the company to enable the Morgan line of steamers to grasp the entire carrying trade through the lakes, by excluding the boats of the plaintiff, an object which the evidence satisfies me the Morgan steamers had previously been unable to do by fair competition. I believe it to be against equity and conscience to give, as this company has avowedly done, undue preferences to one party to injure another. Not even the plea that circumstances may justify the violation of individual right to promote the general good, can be interposed in this case. The evidence is that the prices of transportation by the Morgan steamers were raised shortly after they got rid of the competition that had been kept up previously by the boats of the plaintiffs, a result naturally and certainly to be expected. I think this a case in which exemplary damages should be awarded to redress a private wrong, and to vindicate public justice.

A judgment rendered recently in the State of Maine upon a state of facts very similar to those presented in this case sustains the views I have expressed. The case in Maine was this: "The defendant, a railroad company, whose charter authorized its directors to make rules for the transportation of freight and passengers, one of which was that freight should be carried only on freight trains, contracted with the Eastern Express Company to give the latter a certain space in the baggage car attached to its passenger trains for the carriage of their goods, and agreed not to let a similar space in such a car to any other express carrier during the continuance of the contract. Plaintiff, another express company, offered packages to be transported upon defendant's passenger trains, when and where the Eastern Express Company loaded their freight, and defendant refused to receive them. Held, that plaintiff might maintain an action of damages for such refusal." American Law Review for April, 1871, page 483.