## MISSOURI PAC. RY. CO. *v.* TEXAS & PAC. RY. CO.

*(Circuit Court, E. D. Louisiana.   January 14, 1887.)*

1. RAILROAD COMPANIES—DISCRIMINATION BETWEEN CONNECTING LINES—TEXAS
   PACIFIC RAILWAY COMPANY—MISSOURI PACIFIC RAILWAY COMPANY.
   Under the charter of the Texas Pacific Railway Company, (16 U. S. St. 578,)
   and the Texas act of May 2, 1873, granting land to it, which forbid discrimina-
   tion by it against any connecting or intersecting road, and the latter of which
   forbids it to enter into any combination in the nature of a partnership with any
   railroad in the state running parallel with it, or in the same direction, that will
   give the latter control of rates on it, a pooling and traffic arrangement made
   by the receivers of the road, or of its successor, the Texas & Pacific Railway
   Company, with the Missouri Pacific Railway Company, which has 200 miles
   of road parallel to its road in Texas, relating to business interchanged in Texas,
   and giving the Missouri Pacific a preference in rates, is illegal, and will be or-
   dered to be abrogated upon objection made by other lines connecting with the
   Texas & Pacific Railway Company's road in Louisiana, although the receivers
   are willing to make the same arrangement with the objecting companies, if
   they will furnish their road with the same amount of business under the same
   conditions, and although the arrangement is satisfactory to the traffic agents
   of the objecting companies, and operates to the benefit of the property in the
   receivers' hands.

2. SAME—TRAFFIC ASSOCIATION.
   Likewise membership in a traffic association is improper, and the receivers
   will be ordered to withdraw therefrom, if the association has power to make
   discriminating rates for or against the Texas & Pacific Railway Company.

In Equity.

*Frank G. Stubbs,* for petitioner.

*W. W. Howe,* for respondent.

PARDEE, J.   In the matter of the intervening petition of the Vicks-
burg, Shreveport & Pacific Railroad Company, and of Frank S. Bond,
receiver of the Vicksburg & Meridian Railroad Company, the petition-
ers allege that they are operating a connecting railway line of the Texas
& Pacific Railway lines, and the gist of their complaint, as a basis of re-
lief, is that the receivers of the Texas & Pacific Railway Company, ap-
pointed by this court in the above-entitled suit, to operate and manage
the lines of the said company, have been and are discriminating against
the lines operated by petitioners, "by requiring and receiving from them
a much higher rate for the carriage of all classes of freight, both east and
west bound, over said lines of which they are and have been receivers,
than said receivers have required or received of other railroad companies
and transportation lines, particularly the said Missouri Pacific Railway
Company, and the said the St. Louis, Iron Mountain & Southern Rail-
road Company, for similar service, and similar carriage of like freight."

The receivers answer at length, and as follows:

#### ANSWER.

*First.* Respondents submit to this honorable court that none of the matters
in the said intervening petition mentioned and complained of are matters in
respect of which the petitioners therein are entitled to relief in this proceed-

ing, and in a court of equity; and they ask to have the same benefit of defense thereto as if they had demurred to said petition.

*Second.* These respondents admit the adoption and existence of the various statutes and constitutional provisions set forth in the said intervening petition, but, for greater certainty as to the specific language of said organic and statutory laws, they pray leave to refer to the same, as the same have been from time to time duly promulgated. But they specially deny that the provisions quoted from the constitution and statutes of the state of Texas have any application to the issue now existing between these respondents and the petitioners in the said intervening petition, or can take away any right conferred by the acts of congress with reference to the Texas & Pacific Railway Company. They do not admit the allegations of said petitioners with respect to the spirit and intent of the acts of congress and various other statutes and constitutional provisions quoted in said petition, but, so far as the same may apply to this controversy, they pray the court to interpret the same.

*Third.* Respondents admit that the Texas & Pacific Railway operates its lines to Shreveport, where it connects with petitioners' lines, and that the Vicksburg, Shreveport & Pacific Railroad was opened for general traffic about August, 1884. They admit that the same person is president of the Missouri, Kansas & Texas Railway Company and of the Texas & Pacific Railway Company, but they submit that this fact has no relevancy to the issues in this proceeding, since the Texas & Pacific Railway is being managed by respondents under the orders of the court. They aver that since their appointment as receivers the transportation department of the Texas & Pacific Railway has been distinct from that of any Missouri Pacific line; and since July, 1886, the freight traffic department has been under the sole charge of your respondents' general freight agent.

*Fourth.* They respectfully submit that it is unnecessary and would be irrelevant to inquire, in such a proceeding as this, into the details of the freight business of the Texas & Pacific Railway Company prior to the appointment of respondents as receivers. They admit their appointment and qualification, but they specially deny that, in managing the lines of railway under their charge, they have, as charged in said intervening petition, at all times or at any time, in violation of law and their duty, discriminated against said petitioners as set forth in said petition, and that they are still so discriminating, and will so continue unless prevented by this honorable court. They admit that certain correspondence was had, set forth as Exhibits A, B, C, and D of said petition; but submit that said letters must be considered in connection with the other facts of this case. They do not admit the correctness of the Memorandum E, annexed as an exhibit of said petition, and they submit that its date, in June, 1884, shows that it has no relevancy to the issues herein, but, if it should be decreed relevant by the court, they leave the petitioners to make such proof of its correctness as they may be advised.

*Fifth.* They aver that in March, 1886, they made, with the lines represented by petitioners, through respective traffic agents, such traffic arrangements as would enable petitioners' said lines to compete on equal terms with all other lines for freight business to points on the Texas & Pacific Railway. Said arrangement was amended or modified from time to time, and finally, on the twenty-eighth of September, 1886, was put in the form of the memorandum hereto annexed as Exhibit R A of this answer. This was still further modified October 2, 1886, by the letter made part hereof as Exhibit R B. They aver that the arrangement set forth in said Exhibits R A and R B was acceptable to the traffic agents of petitioners' lines, and has been and is now in operation, without prejudice, however, to the hearing and decision of the issues in this matter. They aver that through rates from Cincinnati, and from other points tributary to petitioners' lines, to points on the Texas &

Pacific Railway, are the same by petitioners' lines as by any other line, and nothing done by respondents has ever operated to divert traffic from petitioners' lines, or to discriminate against them. They specially deny that they have ever charged petitioners to or from Shreveport for freight any more than they charge for freight over their (respondents') own line, and they show that since March, 1886, such charges, as a rule, have been less than those made on their (respondents') own line, and less than justified by the letter of the law.

*Sixth.* Respondents aver that from the time they took possession of the Texas & Pacific Railway until September 1, 1886, the division of revenue on business interchanged between the roads of the Missouri Pacific system, intersecting the Texas & Pacific Railway, including the St. Louis, Iron Mountain & Southern and the Missouri, Kansas & Texas Railroads, was made on the basis of what was known as the "Gault-Tucker award," made by two expert traffic managers, viz., John C. Gault, now general manager of the petitioners' lines, and Joseph F. Tucker, then traffic manager of the Illinois Central system, and now assistant general manager of the Chicago, Milwaukee & St. Paul Railway. On the first of September, 1886, a new agreement for division of revenue on business interchanged between the said roads of the Missouri Pacific system and the Texas & Pacific Railway was duly made and executed, which has been in operation and duly acted upon by the parties thereto since said first of September, 1886. A copy of the same is made part hereof, as Exhibit R C of this answer. The petition and order to answer in this proceeding were served on the receivers through Lionel A. Sheldon, one of your respondents, on the ninth of September, 1886. They show that at the time of such service, and since, they have, as above, been acting in the premises under said agreement of September 1, 1886.

*Seventh.* Your respondents aver that the Missouri Pacific roads intersect the Texas & Pacific Railway at eight different points, while the Vicksburg, Shreveport & Pacific intersects the same at but one point. The effect is that the Missouri Pacific roads could, in the absence of this agreement of September 1st, deliver freight at these eight points without any payment to the Texas & Pacific Railway, and could also deliver freight for local points on the Eastern division of the Texas & Pacific Railway at better revenue to the Missouri Pacific roads than derived under said agreement. In other words, the Missouri Pacific roads pay more in many instances, under said agreement, than they would in its absence; whereas, at Shreveport, petitioners' roads pay nothing in this way, but are in sharp local competition. As to the Rio Grande division, its principal business is the transportation of cattle, and the principal markets are St. Louis and Chicago. As to this business, petitioners' roads can offer respondents nothing, while the division of revenue therefrom allowed by the Missouri Pacific roads under said agreement is a liberal one. This fact is important in considering the propriety of the agreement of September 1, 1886. They further show that the effect of said agreement of September 1, 1886, is to give the Texas & Pacific Railway a large business in lumber from the pineries of Louisiana and Texas, and in salt from the mines of Iberia, for the north-west, which it could not do to advantage in the absence of the division of rates established by said agreement. They show that the same is true of the business in cotton to Mexico, and wheat to mills on its line. They further show that, in consequence of the position of Missouri Pacific lines on both sides of the Texas & Pacific road, the said agreement preserves to the latter a large amount of business which might be diverted by transportation over Missouri Pacific Railway lines now existing, or easily built. Said agreement also secures to the Texas & Pacific a quantity of business controlled by the Missouri Pacific system, destined to points competitive between the Texas & Pacific and other lines which also directly intersect Mis-

souri Pacific lines. They further show that the amount of business contributed by the Missouri Pacific lines to the Texas & Pacific lines is immensely greater than that to and from the lines of petitioners. From January 1, 1886, to September 3, 1886, the Missouri Pacific system contributed, in all, 615,-475,809 pounds of freight, the revenue to the Texas & Pacific being $963,-515.01; and from petitioners' lines during the same period there were contributed but 18,448,785 pounds, the revenue to the Texas & Pacific being only $42,904.21. And respondents annex as part hereof the statements by W. W. Finley, their general freight agent, which they believe to be correct, of the advantages to the property under their charge of the said agreement of September 1, 1886; said statements being marked "R D" and "R E." And respondents, therefore, show that the petitioners' lines are not able to furnish any such amount of business or advantageous interchange of traffic as the Missouri Pacific lines. The amount of business properly going from respondents' lines to those of petitioners at Shreveport is small, and the business coming to respondents' lines at that point from petitioners has always been tributary, to a large extent, through other channels. As to the demand for "solid billing" made in the said intervening petition, respondents show that they have expressed to petitioners a willingness to make an arrangement for such solid billing, and are still willing to do so.

*Eighth.* Your respondents show that they have not in the premises violated any provision of the charter of the Texas & Pacific Railway Company, nor any other provision of law governing their action. They submit that all provisions of the charter, and of other laws which may apply, must receive the interpretation which long-established usage and the custom of the commercial world have given them. This custom has always taken into consideration the difference between transactions at wholesale and at retail, and the difference between dealing with large shippers and with small ones. They aver that special arrangements with large shippers, under proper circumstances, do not amount to inequality, but promote reasonable equality. They submit that, in the execution of their duties for the benefit of the property under their charge, they have but exercised a legal discretion in the premises in making such arrangements with the Missouri Pacific roads, and with the lines of petitioners, as will, without unjust discrimination, confer the fullest benefit on the trust they represent. They submit that the arrangement made as aforesaid with petitioners gives them lower rates than they are entitled to under the letter of the law. The arrangement made as aforesaid, with the Missouri Pacific system of September 1, 1886, does not operate an unjust discrimination or inequality, but a reasonable equality, considering the facts above set forth. They submit that any other interpretation of the statutes in question would defeat their object, and result in that unreasonable equality which is the most noxious inequality. They aver that whenever the petitioners in this proceeding are ready to tender them the same amount of business, and the same advantages of interchange, under the same conditions as the Missouri Pacific system, they believe they will be ready to make with them an arrangement similar to that made with said Missouri Pacific system on said first of September.

### SUPPLEMENTAL ANSWER.

In addition to the details given in their original answer hereto, filed November 10, 1886, and reiterating said answer, they aver that respondents have no connection with the important markets of St. Louis and Chicago except over lines of the Missouri Pacific system; that in the important article of coal, of which they consume about $100,000 worth annually, the same is furnished them over Missouri Pacific lines at $1.25 per ton cheaper, freight included, than by petitioners' lines; that from Texarkana to Longview, a distance of

about 100 miles, all the traffic of the Missouri Pacific system in questio 1 herein passes over the Texas & Pacific Railway, to the great advantage of the latter; and that from Whitesboro to Fort Worth, a distance of 71 miles, the track is owned by the Texas & Pacific Railway Company; and the agreement with the Missouri Pacific system which took effect September 1, 1886, (dated August —, 1886,) and marked herein Exhibit R C, contains provisions advantageous to the Texas & Pacific Railway for sharing the business of that portion of the latter's line, which the petitioners never have offered, and cannot offer.

The matter is submitted on petition and answer, and, although the argument has extended over a wide territory, I feel compelled to restrict my examination of the case to the facts as admitted by the pleadings, the answer being taken as true.

It will be noticed that the answer, while in terms denying all discrimination against petitioners, goes fully into a statement of the previous and present relations, dependency, connections, and joint business of the Texas & Pacific Railway with the Missouri Pacific Railway system, and makes part of the answer the existing traffic contract with the Missouri Pacific Railway Company and its leased and operated lines, entered into after the petition was filed, but before it was served upon the receivers. That contract covers division of rates, division of traffic and earnings, and joint track operation and expenses, and amounts to what is known in railway parlance as a general pooling and traffic arrangement. Section 3 of article 2, division of traffic and earnings of said contract, provides as follows:

"In consideration of the above divisions, and the further agreement mutually made between the respective companies to work as heretofore, in so far as they legally can, to the end of sending all the traffic they control over the lines of the system of the other, to or from points reached by the respective systems, in preference to the roads of other companies not parties to this agreement, and a further agreement on the part of each that they will not give other connecting lines equal rates and facilities as herein contained for each, without such connecting lines shall pay an equal consideration therefor, and a further agreement that the business between local stations on the lines of the parties hereto shall be routed in the same general manner as prior to the receivership of the Texas & Pacific Railway, except as hereafter changed by mutual agreement, or by the construction or control of either party hereto of new roads forming shorter routes, the parties hereto agree to divide as hereinafter provided," etc.

It is contended by the petitioners that this contract of itself, but particularly in the light of the above-quoted provision, shows a preference in rates, business, and facilities to do business on the part of the receivers of the Texas & Pacific in favor of the Missouri Pacific system, and against all other connecting lines. This contention seems to be well founded. A preference in rates and business in favor of one connecting line is a discrimination against other connecting lines.

This contention is sought to be met with the propositions that the contract is not unlawful; that it operates to the benefit of the trust property; that the present traffic arrangement with petitioners' lines is a fair one, and acceptable to the traffic agents of said lines, and thereunder the charges are less than justified by the letter of the law, being less than

local charges on the Texas & Pacific lines; and that respondents are ready and willing to make the same arrangement with petitioners' lines, provided the latter will furnish them the same amount of business, under the same conditions and advantages of interchange.

That the contract is not unlawful does not so plainly appear. As a general proposition, where a railroad company is not restricted or inhibited by its charter or the law of the land, it may be conceded that it is not unlawful for it to make an arrangement for special purposes, on a sufficient consideration, and for the legitimate increase of its business, (*Nicholson* v. *Great Western Ry.*, 5 C. B. (N. S.) 366;) or that a carrier may *prorate* through freight with one, and not with another, (*Eclipse Tow-boat Co.* v. *Pontchartrain R. Co.*, 24 La. Ann. 1;) or that, so far as the common law is concerned, the question is whether the rate to the complaining party is reasonable, (*Johnson* v. *Pensacola, etc., R. Co.*, 16 Fla. 664; *Fitchburg R. Co.* v. *Gage*, 12 Gray, 393;) although the authority of all these cases is shaken by the case of *Scofield* v. *Railway Co.*, 43 Ohio St. 571, and the authorities there cited.

The fact is that the Texas & Pacific Railway Company is hampered by its charter, as well as by the laws of Texas, in regard to discrimination for or against connecting lines. Section 15 of the original charter to the Texas Pacific Railroad Company (16 U. S. St. at Large, 578) is as follows:

"That all railroads constructed, or that may be hereafter constructed, to intersect said Texas & Pacific Railroad, shall have a right to connect with that line; that no discrimination as regards charges for freight or passengers, or *in any other matter*, shall be made by said Texas Pacific Railroad Company against any of the said connecting roads, but that the same charges per mile as to passengers and per ton per mile as to freight, passing from said Texas Pacific Railroad over any of said connecting roads, or passing from any of said connecting roads over any part of said Texas Pacific Railroad, shall be made by said company as they make for freight and passengers over their own road: provided, also, that said connecting roads shall reciprocate said right of connection and equality of charges with said Texas Pacific Railroad: and provided, further, that the rates charged for carrying passengers and freight per mile shall not exceed the prices that may be fixed by congress for carrying passengers and freight on the Union Pacific and Central Pacific Railroads."

By act of congress approved May 2, 1872, (17 St. at Large, 59,) among other provisions, the name, style, and title of the Texas Pacific Railroad Company was changed to that of the Texas & Pacific Railway Company, and this provision was made, to-wit:

"That all roads terminating at Shreveport shall have the right to make the same running connections, and shall be entitled to the same privileges for the transaction of business in connection with the Texas & Pacific Railway, as are granted to roads intersecting therewith."

Congress, by the act of 1871, granted some 15,000,000 acres of the public land to aid in the construction of the Texas Pacific Railroad. On the second of May, 1873, the legislature of the state of Texas passed "An act to adjust and define the rights of the Texas & Pacific Railroad Company within the state of Texas," etc. Under this act the line of the road

was distinctly defined, and certain grants and donations of land (nearly 5,000,000 acres) were made by the state to aid in its construction; these grants and donations being made subject to the conditions named in the last paragraph of section 9 of said act, to-wit, "that said Texas & Pacific Railway Company shall be subject to such general laws as may be enacted by the legislature applicable to other railroads constructed within the state." And in section 10, to-wit, that "all railroads in this state constructed, or that may hereafter be constructed, to intersect said Texas Pacific road, shall have a right to connect with that line; that no discrimination in regard to charges for freight or passengers, *or in any other matter*, shall be made by said Texas Pacific Railroad Company against any of the said connecting roads, but that the charges per mile as to passengers and freight passing from the said Texas Pacific Railroad over any of the said connecting roads, or passing from any of the said connecting roads over any part of the Texas Pacific Railroad, shall be governed and controlled by the laws of this state, now or hereafter to be enacted; * * * and said railroad company shall not have the right or power to consolidate with, or sell or rent or lease the same to, any other railroad in this state, or to purchase or lease, *nor enter into any combination in the nature of a partnership* with, any railroad in this state running parallel with the said Texas & Pacific Railroad, or in the same general direction, that would in any way or manner give the said company the power or right to control the rates of freight and passage on said railroad so purchased or leased; and, should the provisions of this section be violated by said company, it shall work a forfeiture of the rights and privileges herein granted." Section 11 of the act requires that "the board of directors shall, within fifteen days from the date of approval of this act, [May 2, 1873,] signify to the governor, by telegraph or otherwise, the acceptance or rejection of the terms and conditions of this act; and, within thirty days from the date of approval of this act, shall file a formal acceptance or rejection of the same with the secretary of state of the state of Texas." It appears that such formal acceptance was duly filed.

The constitution of the state of Texas, art. 10, reads as follows:

"Section 1. Any railroad corporation or association organized under the law for the purpose shall have the right to construct and operate a railroad between any points within this state, and to connect at the state line with railroads of other states. Every railroad company shall have the right with its road to intersect, connect with, or cross any other railroad, and shall receive and transport each other's passengers, tonnage, and cars, loaded or empty, without delay *or discrimination*, under such regulations as shall be prescribed by law.

"Sec. 2. Railroads heretofore constructed, or that may hereafter be constructed, in this state, are hereby declared public highways, and railroad companies common carriers. The legislature shall pass laws to correct abuses, and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this state."

"Sec. 5. No railroad or other corporation, or the lessees, purchasers, or managers of any railroad corporation, shall consolidate the stock, property, or franchises of such corporation with, or lease or purchase the works or franchises of, or in any way control, any railroad corporation owning, or having

under its control, a parallel or competing line; nor shall any officer of such railroad corporation act as an officer of any other railroad corporation owning or having the control of a parallel or competing line."

It is contended in this case that the laws of Texas can have no force, because the connection between petitioners' lines and respondents' lines is not in Texas, but in Louisiana; but this view loses sight of the fact that the contract under consideration is made with railway lines in Texas, with reference entirely to business interchanged in Texas. It would seem, too, that, under the circumstances, the regulations of the laws of Texas with regard to the matters here involved should be binding on the Texas & Pacific Railway Company in morals, if not in law. Of course, the provisions of the charter and the supplemental charter are binding on the company, and on the respondents, who are operating the railway lines under the franchises and rights granted the company.

Under these provisions of section 15 of the charter, and of the laws of Texas, accepted by the Texas & Pacific Railway Company for a consideration, it is by no means clear that the discrimination stipulated in the contract or agreement with the Missouri Pacific system is lawful. Both the charter and Texas grant provide that no discrimination, as regards charges for freight or passengers, or *in any other matter*, shall be made by said Texas & Pacific Railway Company against any of the connecting or intersecting roads; and in the Texas grant as well as in the Texas law is the further provision that said railway company shall not *enter into any combination in the nature of a partnership*, with any railroad in the state running parallel with the said Texas & Pacific, or in the same general direction that would in any way or manner give the said company the power to control the rates of freight and passage on said railroad. That the contract gives the Missouri Pacific lines advantages not granted to other connecting and intersecting lines is apparent from the extract given. That the Missouri Pacific lines are to a considerable extent in competition with the Texas & Pacific lines appears from the reasons given by respondents for entering into the contract. That the Missouri Pacific system has more than 200 miles of railway in Texas parallel to the lines of the Texas & Pacific lines appears by the record. If the contract with the Missouri Pacific system be unlawful, as not in consonance with the acts of congress and the laws of Texas, then the consideration that it operates to the benefit of the trust property can have no weight. Neither is it material that the present arrangements with petitioners' lines are fair and satisfactory to petitioners' agents.

The proposition that the respondents are ready and willing to make the same arrangements with petitioners' lines, provided the latter will tender them the same amount of business, under the same conditions, is plausible only to the eye. The general tone of the answers of respondents seems to justify a discrimination in favor of connecting lines on the basis of the amount of business furnished; as, for instance, within a given period, the Missouri Pacific system furnished the Texas & Pacific over 615,000,000 pounds of freight, while during the same period the petitioners' lines only furnished about 18,000,000 pounds.

Generally, I consider that the case of *Scofield* v. *Railway Co.*, *supra*, is the best exposition and furnishes the true rule on this subject; but for the Texas & Pacific Railway the matter is settled by its charter, § 15, *supra*,—"but that the *same* charges per mile as to passengers, and *per ton per mile* as to freight, * * * shall be made by said company. as they make for freight and passengers over their own road." And in this connection it may be proper to say that a proper construction of said section 15 does not permit that connecting roads should be charged less or more per ton per mile as to freight, or less or more per mile as to passengers, than the rates charged on or over the Texas & Pacific lines, but the *same*. In other words, section 15 is in the interest of and for the protection of shippers local to the Texas & Pacific Railway, as well as in the interest of and for the protection of connecting lines. If respondents are, as they seem to say, charging the petitioners' lines less per ton per mile than the charges made on respondents' lines to other shippers under the same conditions as to distance and shipping points, then respondents are discriminating, (and probably against shippers that are forced to use their lines;) which ought not to be permitted under any circumstances, and particularly on a railroad to the construction of which the general government and the state of Texas contributed so large a portion of the public lands.

For the relief of petitioners, an order will be entered directing the receivers to give them the same rates and the same privileges for doing business in all respects as are given to other connecting or intersecting lines, substantially as prayed for in their petition.

In one of the exhibits attached to the petition I notice the statement made by the general freight agent of the respondents "that the question of through rates into Texas is not absolutely controlled by the Missouri Pacific Railway, or the Texas & Pacific Railway, but by the Texas Traffic Association, of which the Texas & St. Louis, the H. & T. C., the Southern Pacific, and G. C. & S. F. Railways are also members;" and, again, "the basis fixed by the Texas Traffic Association for the division of rates from Louisville and Cincinnati to common points in Texas, like Dallas and Fort Worth, via New Orleans and all lines, is as follows." Whether these statements imply any power in the Texas Traffic Association to make discriminating rates for or against the Texas & Pacific Railway, or against any railway connecting or intersecting with the Texas & Pacific Railway, as to shipments via the Texas & Pacific, does not appear. If any such power is vested in the Texas Traffic Association, then the connection of the receivers of the Texas & Pacific Railway Company with that association is as obnoxious as the hereinbefore referred to contract with the Missouri Pacific Railway system. As these matters have been brought to the attention of the court, and considering that the receivers are operating the lines of the Texas & Pacific Railway under the orders and protection of the court, to the end that the duties and obligations devolving upon the Texas & Pacific Railway Company as a public carrier under its charter may be performed, and that the public may not suffer detriment by the non-user of its franchises, as well as to pre-

serve the property of the company for its creditors; and considering that it is the duty of the receivers to adhere to and comply with the charters and grants to the company by which their franchises and privileges were obtained; and considering, further, that the aforesaid contract between the said receivers and the Missouri Pacific Railway Company is in violation of the laws of Texas, and not authorized by the charter of the Texas & Pacific Railway Company, and that the Texas Traffic Association may be likewise obnoxious,—an order of the court's own motion will be entered in this cause, directing the receivers to abrogate and annul the said contract with the Missouri Pacific Railway system, so far as it contemplates discrimination against intersecting or connecting lines, and so far as it constitutes or stipulates any combination in the nature of a partnership with the Missouri Pacific Railway system in Texas; and advising the said receivers to withdraw from all connection with the Texas Traffic Association unless they are able to report that, under the rules of said association, they are not required to discriminate in any manner for or against any connecting or intersecting line of railway, or for or against any shipper or the public.

This opinion, and the orders herein directed, are not to be construed as any reflection upon the receivers. They received the property of the Texas & Pacific Railway Company, which is a railway system by itself, in a dilapidated condition, with all the complications and entanglements arising from the fact that for years it formed an integral part of the Missouri Pacific Railway system, and their management so far has been so wise and judicious that they retain the full confidence of the court, and merit the warmest approval from all financially interested in the prosperity of the railway.